JENNESS ET AL. *v.* FORTSON, SECRETARY OF STATE OF GEORGIA

No.. 5714.   Argued March 1, 1971—Decided June 21, 1971

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined.  BLACK and HARLAN, JJ., concurred in the result.

*Peter E. Rindskopf* argued the cause for appellants. With him on the brief was *Howard Moore, Jr.*

*Robert J. Castellani,* Assistant Attorney General of Georgia, argued the cause for appellee.  With him on the brief were *Arthur K. Bolton,* Attorney General, and *Harold N. Hill, Jr.,* Executive Assistant Attorney General.

MR. JUSTICE STEWART delivered the opinion of the Court.

Under Georgia law a candidate for elective public office who does not enter and win a political party's primary election can have his name printed on the ballot at the general election only if he has filed a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question.[1] Georgia law also provides that a candidate for elective public office must pay a filing fee equal to 5% of the annual salary of the office he is seeking.[2] This litigation arose when the appellants, who were prospective candidates and registered voters,[3] filed a class action in the United States District Court for the Northern District of Georgia, attacking the constitutionality of these provisions of the Georgia Election Code, and seeking declaratory and injunctive relief.

A three-judge court was convened pursuant to 28 U. S. C. §§ 2281 and 2284. Thereafter the appellants filed a motion for summary judgment based upon a stipulation as to the relevant facts. The District Court granted the motion and entered an injunction with respect to the filing-fee requirement, holding that this requirement operates to deny equal protection of the laws as applied to those prospective candidates who cannot afford to pay the fees. No appeal was taken from that injunctive order. With respect to the nominating-peti-

---

[1] Ga. Code Ann. § 34–1010 (1970).

[2] Ga. Code Ann. § 34–1013.

[3] One of the appellants was the nominee of the Georgia Socialist Workers Party for Governor in 1970, two others were nominees of that organization for the House of Representatives, and two others were registered voters who sued on behalf of themselves, and "all other registered voters in the State of Georgia desirous of having an opportunity to consider persons on the ballot other than nominees of the Democratic and Republican parties."

tion requirement, the District Court denied the motion and refused to enter an injunction, holding that this statutory provision is constitutionally valid.[4] From that refusal a direct appeal was brought here under 28 U. S. C. § 1253, and we noted probable jurisdiction.[5]

The basic structure of the pertinent provisions of the Georgia Election Code is relatively uncomplicated. Any political organization whose candidate received 20% or more of the vote at the most recent gubernatorial or presidential election is a "political party."[6] Any other political organization is a "political body."[7] "Political parties" conduct primary elections, regulated in detail by state law, and only the name of the candidate for each office who wins this primary election is printed on the ballot at the subsequent general election, as his party's nominee for the office in question.[8] A nominee of a "political body" or an independent candidate, on the other hand, may have his name printed on the ballot at the general election by filing a nominating petition.[9] This petition must be signed by "a number of electors of not less than five per cent. of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking . . . ."[10] The total time allowed for circulating a nominating petition is 180 days,[11] and it must be filed on the second Wednesday in

---

[4] *Georgia Socialist Workers Party* v. *Fortson*, 315 F. Supp. 1035.

[5] 400 U. S. 877.

[6] Ga. Code Ann. § 34–103 (u).

[7] Ga. Code Ann. § 34–103 (s).

[8] See, *e. g.*, Ga. Code Ann. §§ 34–1004 to 34–1006, 34–1008, 34–1009, 34–1014, 34–1015, 34–1102, 34–1301 to 34–1303, 34–1308, 34–1507, 34–1513.

[9] Ga. Code Ann. § 34–1001.

[10] Ga. Code Ann. § 34–1010 (b).

[11] Ga. Code Ann. § 34–1010 (e).

June, the same deadline that a candidate filing in a party primary must meet.[12]

It is to be noted that these procedures relate only to the right to have the name of a candidate or the nominee of a "political body" printed on the ballot. There is no limitation whatever, procedural or substantive, on the right of a voter to write in on the ballot the name of the candidate of his choice and to have that write-in vote counted.

In this litigation the appellants have mounted their attack upon Georgia's nominating-petition requirement on two different but related constitutional fronts. First, they say that to require a nonparty candidate to secure the signatures of a certain number of voters before his name may be printed on the ballot is to abridge the freedoms of speech and association guaranteed to that candidate and his supporters by the First and Fourteenth Amendments. Secondly, they say that when Georgia requires a nonparty candidate to secure the signatures of 5% of the voters before printing his name on the ballot, yet prints the names of those candidates who have won nomination in party primaries, it violates the Fourteenth Amendment by denying the nonparty candidate the equal protection of the laws. Since both arguments are primarily based upon this Court's decision in *Williams* v. *Rhodes,* 393 U. S. 23, it becomes necessary to examine that case in some detail.

In the *Williams* case the Court was confronted with a state electoral structure that favored "two particular parties—the Republicans and the Democrats—and in effect tend[ed] to give them a complete monopoly." *Id.,* at 32. The Court held unconstitutional the election laws of Ohio insofar as in combination they made it "vir-

---

[12] Compare Ga. Code Ann. § 34–1002 (b) with Ga. Code Ann. § 34–1005 (b).

tually impossible for a new political party, even though it ha[d] hundreds of thousands of members, or an old party, which ha[d] a very small number of members, to be placed on the state ballot" in the 1968 presidential election. *Id.,* at 24. The state laws made "no provision for ballot position for independent candidates as distinguished from political parties," *id.,* at 26, and a new political party, in order to be placed on the ballot, had "to obtain petitions signed by qualified electors totaling 15% of the number of ballots cast in the last preceding gubernatorial election." *Id.,* at 24–25. But this requirement was only a preliminary. For, although the Ohio American Independent Party in the first six months of 1968 had obtained more than 450,000 signatures—well over the 15% requirement—Ohio had nonetheless denied the party a place on the ballot, by reason of other statutory "burdensome procedures, requiring extensive organization and other election activities by a very early date," *id.,* at 33—"including the early deadline for filing petitions [February 7, 1968] and the requirement of a primary election conforming to detailed and rigorous standards . . . ." *Id.,* at 27.[13]

[13] In describing these burdens, the Court quoted the description contained in the dissenting opinion of a member of the three-judge District Court from which the appeal in the *Williams* case had come:

"Judge Kinneary describes, in his dissenting opinion below, the legal obstacles placed before a would-be third party even after the 15% signature requirement has been fulfilled:

" '*First,* at the primary election, the new party, or any political party, is required to elect a state central committee consisting of two members from each congressional district and county central committees for each county in Ohio. [Ohio Rev. Code §§ 3517.02–3517.04.] *Second,* at the primary election the new party must elect delegates and alternates to a national convention. [Ohio Rev. Code § 3505.10.] Since Section 3513.19.1, Ohio Rev. Code, prohibits a candidate from seeking the office of delegate to the national convention or committeeman if he voted as a member of a different party at a primary election in the preceding four year period, the

In a separate opinion MR. JUSTICE DOUGLAS described the then structure of Ohio's network of election laws in accurate detail:

"Ohio, through an entangling web of election laws, has effectively foreclosed its presidential ballot to all but Republicans and Democrats. It has done so initially by abolishing write-in votes so as to restrict candidacy to names on the ballot; it has eliminated all independent candidates through a requirement that nominees enjoy the endorsement of a political party; it has defined 'political party' in such a way as to exclude virtually all but the two major parties.

"A candidate who seeks a place on the Ohio presidential ballot must first compile signatures of qualified voters who total at least 15% of those voting in the last gubernatorial election. In this election year, 1968, a candidate would need 433,100 such signatures. Moreover, he must succeed in gathering them long before the general election, since a nominating petition must be filed with the Secretary of State in February. That is not all: having compiled those signatures, the candidate must further show that he

_new party would be required to have over twelve hundred members who had not previously voted in another party's primary, and who would be willing to serve as committeemen and delegates. Third, the candidates for nomination in the primary would have to file petitions signed by qualified electors. [Ohio Rev. Code § 3513.05.] The term "qualified electors" is not adequately defined in the Ohio Revised Code [§ 3501.01 (H)], but a related section [§ 3513.19], provides that a qualified elector at a primary election of a political party is one who, (1) voted for a majority of that party's candidates at the last election, or, (2) has never voted in any election before. Since neither of the political party plaintiffs had any candidates at the last preceding regular state election, they would, of necessity, have to seek out members who had never voted before to sign the nominating petitions, and it would be only these persons who could vote in the primary election of the new party.'" 393 U. S., at 25 n. 1._

has received the nomination of a group which qualifies as a 'political party' within the meaning of Ohio law. It is not enough to be an independent candidate for President with wide popular support; one must trace his support to a political party.

"To qualify as a party, a group of electors must participate in the state primary, electing one of its members from each county ward or precinct to a county central committee; two of its members from each congressional district to a state central committee; and some of its members as delegates and alternates to a national convention. Moreover, those of its members who seek a place on the primary ballot as candidates for positions as central committeemen and national convention delegates must demonstrate that they did not vote in any other party primary during the preceding four years; and must present petitions of endorsement on their behalf by anywhere from five to 1,000 voters who likewise failed to vote for any other party in the last preceding primary. Thus, to qualify as a third party, a group must first erect elaborate political machinery, and then rest it upon the ranks of those who have proved both unwilling and unable to vote." 393 U. S., at 35–37.

The Court's decision with respect to this "entangling web of election laws" was unambiguous and positive. It held that "the totality of the Ohio restrictive laws taken as a whole imposes a burden on voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause." *Id.*, at 34.[14]

---

[14] MR. JUSTICE DOUGLAS, while joining the opinion of the Court, filed a separate opinion giving emphasis to the First Amendment values involved. *Id.*, at 35. MR. JUSTICE HARLAN filed an opinion concurring in the judgment, explaining why he would have rested

438

But the *Williams* case, it is clear, presented a statutory scheme vastly different from the one before us here. Unlike Ohio, Georgia freely provides for write-in votes. Unlike Ohio, Georgia does not require every candidate to be the nominee of a political party, but fully recognizes independent candidacies. Unlike Ohio, Georgia does not fix an unreasonably early filing deadline for candidates not endorsed by established parties. Unlike Ohio, Georgia does not impose upon a small party or a new party the Procrustean requirement of establishing elaborate primary election machinery. Finally, and in sum, Georgia's election laws, unlike Ohio's, do not operate to freeze the political status quo. In this setting we cannot say that Georgia's 5% petition requirement violates the Constitution.

Anyone who wishes, and who is otherwise eligible, may be an independent candidate for any office in Georgia. Any political organization, however new or however small, *is* free to endorse any otherwise eligible person as its candidate for whatever elective public office it chooses. So far as the Georgia election laws are concerned, independent candidates and members of small or newly formed political organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. They may confine themselves to an appeal for write-in votes. Or they may seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question. If they choose the latter course, the way is open. For Georgia imposes no suffocating restrictions whatever upon the free circulation of nominating petitions. A voter may sign a petition even though he

decision "entirely on the proposition that Ohio's statutory scheme violates the basic right of political association assured by the First Amendment which is protected against state infringement under the Due Process Clause of the Fourteenth Amendment." *Id.*, at 41.

has signed others,[15] and a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary.[16] The signer of a petition is not required to state that he intends to vote for that candidate at the election.[17] A person who has previously voted in a party primary is fully eligible to sign a petition,[18] and so, on the other hand, is a person who was not even registered at the time of the previous election.[19] No signature on a nominating petition need be notarized.[20]

The open quality of the Georgia system is far from merely theoretical. For the stipulation of facts in this record informs us that a candidate for Governor in 1966 [21] and a candidate for President in 1968,[22] gained ballot designation by nominating petitions, and each went on to win a plurality of the votes cast at the general election.[23]

In a word, Georgia in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life. Thus, any political body that wins as much as 20% support at an election becomes a "political party" with its attendant ballot position rights and primary election obligations, and any "political party." whose support at the polls falls below that figure reverts to the status of a "political body" with its attendant

---

[15] Contrast, *e. g.*, La. Rev. Stat. Ann. § 18:624 (A) (1969); N. Y. Election Law § 138 (6) (1964).

[16] Contrast, *e. g.*, R. I. Gen. Laws Ann. § 17–16–8 (1969).

[17] Contrast, *e. g.*, N. Y. Election Law § 138 (2) (1964).

[18] Contrast, *e. g.*, Cal. Elections Code § 6830 (c) (1961); Colo. Rev. Stat. Ann. § 49–7–1 (4) (Supp. 1967).

[19] Contrast, *e. g.*, N. Y. Election Law § 138 (2) (1964).

[20] Contrast, *e. g.*, Colo. Rev. Stat. Ann. § 49–7–1 (4) (Supp. 1967).

[21] See *Fortson* v. *Morris*, 385 U. S. 231.

[22] This was the candidate whose party Ohio had kept off the ballot in *Williams* v. *Rhodes*, 393 U. S. 23.

[23] As a result, the political bodies that endorsed these two candidates have now presumably acquired the status of political parties.

nominating petition responsibilities and freedom from primary election duties. We can find in this system nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments.

The appellants'. claim under the Equal Protection Clause of the Fourteenth Amendment fares no better. This claim is necessarily bottomed upon the premise that it is inherently more burdensome for a candidate to gather the signatures of 5% of the total eligible electorate than it is to win the votes of a majority in a party primary.[24] That is a premise that cannot be uncritically accepted. Although the number of candidates in a party primary election for any particular office will, of course, vary from election to election, the appellee's brief advises us that in the most recent election year there were 12 candidates for the nomination for the office of Governor in the two party primaries. Only two of these 12, of course, won their party primaries and had their names printed on the ballot at the general election. Surely an argument could as well be made on behalf of the 10 who lost, that it is *they* who were denied equal protection *vis-à-vis* a candidate who could have had his name printed on the ballot simply by filing a nominating petition signed by 5% of the total electorate.

The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization.[25] We cannot see how

---

[24] Georgia provides for a second "run-off" primary election in the event no candidate receives a majority of the votes cast at the original primary election. See Ga. Code Ann. § 34–1513 (a).

[25] The argument that the first alternative route is not realistically open to a candidate with unorthodox or "radical" views is hardly valid in the light of American political history. Time after time

Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

Insofar as we deal here with the claims of a "political body," as contrasted with those of an individual aspirant for public office or an individual voter,[26] the situation is somewhat different. For it is true that a "political party" in Georgia is assured of having the name of its nominee—the primary election winner—printed on the ballot, whereas the name of the nominee of a "political body" will be printed only if nominating petitions have been filed that contain the requisite number of signatures. But we can hardly suppose that a small or a new political organization could seriously urge that its interests would be advanced if it were forced by the State to establish all of the elaborate statewide, county-by-county, organizational paraphernalia required of a "political party" as a condition for conducting a primary election.[27] Indeed, a large reason for the Court's invalidation of the Ohio election laws in *Williams* v. *Rhodes*, *supra*, was precisely that Ohio *did* impose just such requirements on small and new political organizations.

The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. Georgia has not been guilty of invidious discrimination

---

established political parties, at local, state, and national levels, have, while retaining their old labels, changed their ideological direction because of the influence and leadership of those with unorthodox or "radical" views.

[26] The Georgia Socialist Workers Party was one of the plaintiffs in the District Court, but is not an appellant here. We may assume, however, without deciding, that the individual appellants can properly assert the interests of that "political body."

[27] See, *e. g.*, Ga. Code Ann. § 34–1004.

in recognizing these differences and providing different routes to the printed ballot. Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in *Williams* v. *Rhodes, supra.*

There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election. The 5% figure is, to be sure, apparently somewhat higher than the percentage of support required to be shown in many States as a condition for ballot position,[28] but this is balanced by the fact that Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes. Georgia in this case has insulated not a single potential voter from the appeal of new political voices within its borders.

*The judgment is affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE HARLAN concur in the result.

---

[28] See *Williams* v. *Rhodes,* 393 U. S., at 47 n. 10 (HARLAN, J., concurring in result).