**Josephine RESTIVO et al., Plaintiffs,**

v.

**CONSERVATIVE PARTY OF the STATE OF NEW YORK et al., Defendants.**

**No. 74 Civ. 4631–CLB.**

United States District Court, S. D. New York.

March 6, 1975.

H. Spencer Kupperman, Jackson & Kupperman, Brooklyn, N. Y., for plaintiffs.

Bernard Gold, Staten Island, N. Y., for defendant De Salivio.

Henry S. Middendorf, Jr., New York City, for other defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintiffs Josephine Restivo and Ann Barlow are residents of the 62nd Assembly District of the State of New York, which is situated partly in New York County and partly in Richmond County (Staten Island). They are, and were at the time of the filing of this complaint on October 22, 1974, registered voters, duly enrolled in the Conservative Party of the State of New York ("the Party"). Plaintiff DelRosso is an enrolled Republican, and was the Republican Party candidate for the office of Assemblyman of that district in the general election of November 5, 1974.

Defendants include, besides the Conservative Party, the Board of Elections, certain individuals who are or were Conservative Party officials, and Louis De-Salvio, an enrolled Democrat who was the Assembly candidate of the Democratic and Conservative parties in that election.

By their complaint, plantiffs seek declaratory relief that certain of the rules and regulations (by-laws) of the New York and Richmond County Committees of the Conservative Party are unconstitutional. Originally, they requested injunctive relief against defendant De-Salvio, the Party and the Board of Elections to remove DeSalvio's name from the ballot as the Conservative Party Assemblyman candidate in the general election held November 5, 1974.

At a hearing held Otober 25, 1974, this Court denied injunctive relief and made findings of fact and conclusions of law with respect thereto. The election was duly held. The vote was:

|  | Richmond County | New York County | Total |
|---|---|---|---|
| Louis DeSalvio (Democratic Line) | 5,268 | 5,737 | 11,005 |
| Louis DeSalvio (Conservative Line) | 940 | 331 | 1,271 |
| Henry DelRosso (Republican Line) | 2,201 | 2,565 | 4,766 |
| Doris Jean Timberlake (Liberal Line) | 892 | 1,175 | 2,067 |

■ Although the election is over, the declaratory relief sought remains justiciable. Issues raised by plaintiffs, described below, are not moot, and are likely to recur. *Cf.* dissent of Oakes, J., in Nieves v. Oswald, (Nieves III), 498 F.2d 802, 816 (2d Cir. 1974) and cases there cited.

■ Various defendants have moved to dismiss the complaint. As these motions are based in part upon affidavits, and in part upon information developed at the hearing in connection with the preliminary injunction, we treat the motion as having been made pursuant to Rule 56, F.R.Civ.P.

■ Plaintiffs showed that they wished to have DelRosso, the Republican candidate for election to the 62nd A.D., nominated by the Conservative Party as its candidate for the same office. Since DelRosso was and is a Republican, his ability to become the candidate of the Conservative Party for this non-judicial office, and the ability of the plaintiffs Restivo and Barlow to choose him as the candidate of their Party was limited by provisions of the Wilson-Pakula law,

New York Election Law, § 137, which provides in effect that a person who is not a member of a political party may not receive that party's nomination, or run in its primary unless that person receives the authorization of the majority of the party's state committee, or of such other group as the party rules may provide.[1]

The state committee of the Party has by party rule, delegated the right to authorize candidacy of a non-member candidate to the county committee.[2] Party rules also provide that where, as here, the area from which an official is to be elected comprises parts of more than one county, and the rules of the county committees in the counties comprising the particular elective area are the same, and delegate as they do here, the powers of the county committee to its chairman, then the two or more chairmen of the two or more counties affected, may exercise the power jointly.[3]

As the result of the direct and ordinary operation of the various rules of the state committee of the Party, and the county committees of the New York County and Richmond County, it eventuated that on July 11, 1974, defendants Middendorf and Kinsella, as County Chairman, respectively, of New York

1. The New York Election Law (17 McKinney's Consol.Laws of N.Y.Ann.1964, c. 17) § 137(4) reads in relevant part as follows:

"4. Notwithstanding the provisions of subdivisions one, two and three of this section, at a meeting of the members of the party committee representing the political subdivision of the office for which a designation or nomination is to be made, or of such other committee as the rules of the party may provide, except as hereinafter in this subdivision provided with respect to certain offices in the city of New York, by a majority vote of those present at such meeting provided a quorum is present, such committee may authorize the designation or nomination of a person as candidate for any office who is not enrolled as a member of such party as provided in this section."

2. Article IX, Section 6(a) of the State Rules and Regulations of the Conservative Party of New York State (1972-4) provides as follows:

"Except to the extent otherwise provided by law with respect to certain offices to be filled by all the voters of the City of New York, the state executive committee shall authorize the designation, nomination or substitution of a person as a candidate for any office who is not enrolled as a member of the Conservative Party; provided, however, that if such person shall be a candidate for an office which falls within a county which has elected a Conservative Party county committee pursuant to the Election Law, and if the rules of said county committee make provision for the authorization of said candidacy, the candidacy shall be authorized in accordance with that provision; and provided further, that if such person shall be a candidate for an office which falls within more than one county, each of which has elected a Conservative Party county committee pursuant to the Election Law, and if the rules of all of these county committees include the same provision for the authorization of said candidacy, the candidacy shall be authorized in accordance with that provision."

3. Article V, Section 1 of the Rules and Regulations of the New York County Committee of the Conservative Party of New York State dated September 11, 1974 reads as follows:

"1. *Authorization of Candidates for Public Office Not Enrolled in the Conservative Party.* The authorization of the designation or nomination of a person as a candidate for any office to be filled by the voters of New York County or the Borough of Manhattan or of any political subdivision within New York County or the Borough of Manhattan at any general, primary, or special election, who is not enrolled as a member of the Conservative Party, shall be made by the County Executive Committee. In the event that office to be filled by the voters of a political subdivision lying partly in New York County or the Borough of Manhattan and partly in any other county or borough (other than offices to be filled by all the voters of the city of New York), such authorization shall be made by a committee consisting of the chairman of the New York County Committee and the Chairman of the other respective County Committees (or in the case of such other counties the body or persons possessing the powers of nomination by law or by the rules of such other respective County Committees or other Party governing body of such other respective counties) of each county in which such political subdivision lies."

and Richmond Counties, were permitted to meet, and did so, as a committee of two. As such, they unanimously authorized defendant DeSalvio to be designated as a candidate in the primary election of their Party to be held September 10, 1974. See their Certificate attached as exhibit to Affidavit of defendant Middendorf, sworn to November 15, 1974. Since no member of the Conservative Party entered the primary by designating petition as provided in § 134 of the New York Election Law, and since no such authorization was granted to DelRosso by the two County Chairmen, the filing of this Certificate by Middendorf and Kinsella, and DeSalvio's acceptance, had the effect of making him the uncontested nominee of the Conservative Party.

The Court has subject matter jurisdiction. The party rules being challenged here derive their force from state statute, § 137 of the Election law, previously mentioned. Plaintiffs Restivo and Barlow are aggrieved thereby because the statute limits their right to vote. We need not reach the issue as to whether plaintiff DelRosso, a Republican, can be aggrieved by a rule of the Conservative Party limiting the right of its members to vote in the primary election, since plaintiffs Restivo and Barlow clearly have standing.

In considering the federal grounds asserted in this action, we are invited to tread a well worn path. In McDonald v. Board of Election, 394 U.S. 802, 807, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), the Court reiterated the holding of Lassiter v. Northhampton County Board of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072 (1959), that "states have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised." Unless "lines are drawn on the basis of wealth [or] race" [Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S. Ct. 1079, 16 L.Ed.2d 169 (1966)] in which case "careful examination is warranted." We are told that (p. 808 of 394 U.S., p. 1408 of 89 S.Ct.) :

"Though the wide leeway allowed the States by the Fourteenth Amendment to enact legislation that appears to affect similarly situated people differently, and the presumption of statutory validity that adheres thereto, admit of no settled formula, some basic guidelines have been firmly fixed. The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them. See McGowan v. Maryland, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393] (1961) ; Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552 [67 S.Ct. 910, 91 L.Ed. 1093] (1947) ; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61 [31 S.Ct. 337, 55 L.Ed. 369] (1911). With this much discretion, a legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489 [75 S.Ct. 461, 99 L.Ed. 563] (1955) ; and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked. See Ozan Lumber Co. v. Union County National Bank, 207 U.S. 251 [28 S.Ct. 89, 52 L.Ed. 195] (1907)."

Recently in Seergy v. Kings County Republican Committee, 459 F.2d 308 (2d Cir. 1972), the Court considered a party rule adopted pursuant to § 12 of the Election law, claimed to violate the "one man—one vote" principle. After reviewing the important state functions

performed by the County Committee of a party, the Court of Appeals held:

"Under state law each political party by appropriate rule determines for itself which committees other than state and county committees shall be formed and in what manner such committees shall be organized."

Clark v. Rose, 379 F.Supp. 73, 76 (S. D.N.Y.1974, three-judge court) considered § 137, the Wilson-Pakula law, and held that the statute allows the political parties, by rule, to delegate to their committees the "power to discriminate as between non-member candidates, granting authorization to one [to be a candidate in a primary election] and denying it to others," but found the underlying statutory scheme valid. As stated in Clark v. Rose, *supra*:

"The Supreme Court has held that a state such as New York has a 'legitimate interest in regulating the number of candidates on the ballot,' Bullock v. Carter, 405 U.S. 134, 145, 92 S. Ct. 849, 857, 31 L.Ed.2d 92 (1972), and 'in avoiding confusion, deception, and even frustration of the democratic process . . .' that can result from an excessive number of non-party candidates. See Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). The Liberal Party and the State of New York have a vital interest in regulating the qualification of candidates for office, including federal office. *Storer*, [Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714] 94 S. Ct. at 1280; *Jenness, supra*, [403 U. S.] at 442, 91 S.Ct. 1970, Art. I, § 4 cl. 1 of the Constitution." (p. 76 of 379 F.Supp.)

The state committee of the Party is elected pursuant to §§ 13 and 136 of the New York Election Law on a basis designed to insure that it accurately reflects the views of the Party members. Such a committee, which has the responsibility of party leadership, may be trusted to determine which of several competing non-member aspirants for party nomination can advance the political philosophy of the Party members to best advantage. As was noted in *Clark, supra*, it is customary and traditional for this power to be delegated by party rule to smaller bodies, even with respect to state-wide candidates. There are legitimate reasons for this delegation, including the fact that the state committee cannot be convened every time there is necessity for considering such an application. Furthermore, in the subdivisions of the State, there is no reason to believe that the entire state committee would have any knowledge as to the relative qualifications or abilities of the aspirants who seek authorization to run on the Conservative line, although not members of that party. As noted in *Clark, supra*, (379 F.Supp. p. 78):

"New York, by enacting the statute, therefore, has reasonably sought to allow fusion tickets where desired without subjecting its political parties and their members to the debilitating effects of voter confusion and usurpation of the party organizations. We believe that the statute, therefore, meets a constitutionally legitimate state purpose within the electoral process."

The statute as applied in this case did not deny plaintiff DelRosso access to the voters, it merely set forth certain conditions precedent to his becoming the candidate of a party in which he is not an enrolled member. Plaintiffs Restivo and Barlow suffered minimal restraints on their voting opportunities and rights, which are more than offset by the compelling state interest mentioned. These plaintiffs could have petitioned for the opportunity to conduct a write-in primary, pursuant to § 148 of the Election law, in which DelRosso could have been a candidate, and in addition, could have signed designating petitions for DelRosso as candidate of an independent group. See Ch. 797 New York Laws of 1974 repealing Ch. 1179 § 1, Laws of 1971, formerly § 138-b of the New York Election Law.

Plaintiffs' allegations are directed primarily at the *wisdom* of the Party by-laws, having the force of statute, which in effect delegates and places in the joint hands of the County Chairmen of New York and Richmond Counties, with respect to a subdivision or Assembly District which comprises parts of both counties, the power granted to the Party's state committee by the statute. The statute contemplated this type of delegation, which is found also in other New York political parties.

Plaintiffs allege (¶15, et seq. of the complaint) that the New York County committee chairman, "without consulting any members of the Executive Committee, decided to permit Richmond County to make the ultimate decision as to who would become the Conservative Party designee, for the 62nd AD Assembly seat." Apparently there is some truth in this allegation. It appeared on the hearing with respect to the preliminary injunction that the defendant Middendorf concluded that more of the district, and greater party strength, was located in Richmond County than in New York County, and that it was an appropriate political decision to defer to the opinion of the Richmond County Chairman, Kinsella, in the choice of a nominee. It does not appear that the New York Chairman abdicated his participation in the decision making procedure. In fact, he signed a certification specifically authorizing the candidacy of Democrat DeSalvio. There is no showing that the decision he made, to agree with his counterpart in Richmond County, was other than a normal and reasonable political decision made according to his judgment and personal viewpoint of what would best serve the interests of the Conservative Party in the Assembly District and elsewhere. There was no legal obligation for Middendorf to notify any other New York County committeeman that he intended to meet with Kinsella and reach such a conclusion.

Other members of the party, including Restivo and Barlow, had the unqualified right to run an enrolled Conservative in the primary election against DeSalvio, or any other person who might have been authorized to run as a non-party member. Plaintiffs allege that (¶18 of the complaint) "the rules and regulations for the New York County Committee permit no challenge to the chairman's authority or ultimate decision and stimulate corrupt electoral processes by permitting political 'deals' to be made with both secrecy and ease." If this be true, then the answer is a simple one; the members of the Party may cause the committee rules to be amended to vest the power in the entire body, or in an executive or special nominating committee, or establish any other means which seems more appropriate. This they may do merely by following ordinary parliamentary procedures.

■■ Furthermore, this Court is not concerned with the wisdom of the rule, but merely with its constitutionality. Such methods of designation have stood the test of time in New York State for many years, and have been practiced by most, if not all, of the recognized political parties. These party rules do not disfranchise any persons, because all county committeemen are entitled to vote for the office of County Chairman, and all enrolled party members are entitled to vote for the County committeemen. Nor is it, as alleged, facially unconstitutional to permit a County Chairman to participate in the choosing of designees for public office to be elected in smaller areas partly or wholly within the County in which the particular Chairman may reside. If Middendorf was arbitrary and capricious in reaching the decision, this is to be threshed out within the party by political means, including electing another Chairman as his successor. Except where their conduct is repugnant to the Constitution or a state or federal statute, party members have the right to establish by duly adopted party rules how the internal affairs of their party are to be regulated. Whatever the wisdom of the rules in effect in the Conservative Party may be, the Court finds no constitutional or stat-

utory infirmity therein. These rules reflect practices and concepts honored by the years.

Prior to enactment of the Primary Election Law of 1899 (Ch. 473 of New York Laws of 1899) political party organizations in New York were regarded as voluntary associations which could and did conduct their own affairs in accordance with their own constitutions and by-laws. The process of designating and nominating party candidates for public office was done through conventions of delegates. Party organization tended to be highly structured, and the business was closely supervised and controlled by the party leaders, relying on the unquestioned loyalty of their adherents. All parties in New York were characterized by a strong chain of command from the state party leader down to the precincts.

Before 1899, as now, local party authority was centralized in county committees composed of representatives from the local districts. These committees nominated local candidates, and in turn selected delegates to state and national conventions. State party control between conventions was centralized in the state committee, composed of one member from each congressional district. It was this committee and its chairman who were responsible for the selection and presentation to state conventions of candidates for governor, state legislators, judges and congressmen. The state chairman often called the "Boss", [4] was thus the most influential and powerful man in the party. See Connable & Siberfarb, Tigers of Tammany: Nine Men Who Ran New York, 1967. The notorious William Marcy Tweed (1828–1878) is most often cited as an example of such centralized leadership, and regarded perhaps as the best known and most corrupt of political despots. Tweed began his career as an alderman of New York City in 1852. In 1857 he was elected to the board of supervisors of New York County which he soon came to dominate. By working for the ouster of Fernando Wood, a notoriously corrupt mayor, Tweed came into power under a cloak of respectability. As a sachem of Tammany Hall beginning in 1858, he handpicked all local officials of New York City, including the mayor. By 1868, with the election of Governor John Hoffman, Tweed also secured control of the State government for his party. A year later, Tweed and his close associates, better known as the "Tweed Ring", began operations which cheated the City of New York out of $200,-000,000.00 over a three year period. However, in 1871 Tweed's activities were exposed and his power over the affairs of the Democratic party ended. Mushkat, Tammany: The Evolution of a Political Machine, 1971.

While the depredations of the Tweed Ring led directly to the reforms of 1899, and cast a cloud over the idea of centralized, authoritarian party leadership, Tweed was neither the first nor the last of the party leaders in whom the faithful reposed nearly absolute power. Whether Aaron Burr or Martin Van-Buren was the first New York State political boss is beyond the scope of our inquiry. In contrast to the bitter experience with Tweed is the history of the Republican leadership in the same years.

Republican bosses were equally adept at dominating the nominating process through strong political machines. Representative of such Republican leadership is the career of Thomas C. Platt (1833–1910), known as "The Easy Boss." Platt's political career began in 1870 when he became the close friend and political adherent of Roscoe Conkling, a state Republican leader, and later, like Platt, United States Senator. Through this association Platt began a swift rise to power and by 1877 was the chairman of the state Republican convention. His hegemony over state Republican affairs lasted until 1902. During this time Platt's domination of the New York Republican organization was complete.

4. From the Old Dutch word "baas," meaning Master.

Each Sunday he and his political adherents met at the Old Fifth Avenue Hotel in New York City. This became the headquarters of the Republican State Committee, and while Platt was also serving as United States Senator during part of this time, he was able to visit New York only on the weekends. Accordingly, important party conferences had to be held on Sundays. His meetings thus became known as "Platt's Sunday School Classes." Here, politicians sat on two sofas at the end of the broad corridor of the Hotel. This corner became known as the "Amen Corner" because whatever conclusions were announced after these conferences with party leaders, as to nominations, platform and policy, there was no dissent. At these meetings all Republican candidates were selected, state jobs distributed and orders issued to the state legislature. Although the state convention met variously at Syracuse, Rochester or Saratoga, the delegates would refuse to act until they were apprised of what had been decided at the "Amen Corner." Thus Platt's power, although it did not result in the creation of a "ring" such as Tweed's, was so pervasive that year after year, the state party conventions followed his prior direction. Unlike the Tweed Ring, the Platt group embezzled no public funds. See Gosnell, Boss Platt and His New York Machine, 1924.

True, there may have been difficulties consequent on party hegemony by chairmen and leaders. But we may not write greater "reforms" than the New York legislature has required, in the numerous revisions to the Election Law which have occurred since the turn of the century. In the political fray, there are virtues still found in unity, and in centralizing authority such as designations

of the sort involved here, in the hands of the duly elected party leader.[5] This fact of civic life is recognized in all parties. The attack thereon by plaintiffs, in the absence of unconstitutionality or a violation of federal statute, must fail.

All defendants are entitled to an order granting summary judgment dismissing the complaint herein.

So ordered.

---

5. This reform legislation did not seek the elimination of the strong leader. In People ex rel. Coffey v. Democratic Committee, 164 N.Y. 335, 341, 58 N.E. 124, 126 (1900), the Court of Appeals of New York characterized the statute:

"[T]he scheme is to permit the voters to construct the organization from the bottom upwards, instead of permitting leaders to construct it from the top downwards."