Lyndon H. LaROUCHE, Jr. and Billy M. Davis, Plaintiffs,

v.

David S. MONSON, Lieutenant Governor of the State of Utah, Defendant.

No. C 84–0859–J.

United States District Court, D. Utah, C.D.

Nov. 21, 1984.

Brian N. Bernard, Utah Legal Clinic, Salt Lake City, Utah, for plaintiffs.

Frank V. Nelson, H. Wright Volker, Joseph P. McCarthy, Asst. Attys. Gen., Salt Lake City, Utah, for defendant.

## MEMORANDUM OPINION

JENKINS, District Judge.

### I. INTRODUCTION

The present controversy involves Plaintiffs' unsuccessful efforts to obtain access to the 1984 General Election ballot in Utah as independent candidates for the Presidency and the Vice-Presidency. Plaintiffs filed their complaint on September 26, 1984, alleging that their constitutional rights as guaranteed by the First, Fifth, Twelfth and Fourteenth Amendments have been violated by the manner of interpretation and enforcement of Utah's election laws, particularly the enforcement of an "early" filing deadline for independent candidates.

The matter came on an expedited calendar on September 27 and September 28, 1984 for a hearing of Plaintiffs' motions for a Temporary Restraining Order and for Preliminary Injunction. Plaintiffs requested the court to enjoin the printing and distribution of the ballot until it could be determined whether Plaintiffs' names should be on that ballot. The court, after considering the affidavits filed by the parties and hearing testimony and argument, denied the motions because Plaintiffs failed to show a reasonable likelihood of success on the merits.

The case is presently before the court on Plaintiffs' Motion for Summary Judgment and Defendant's Motion to Dismiss. Plaintiffs request the court to declare Utah's election laws found at Utah Code Ann. (U.C.A.) §§ 20–3–38 and 20–4–9 unconstitutional.[1] Defendant moves to dismiss the

---

**1.** In their motion for Summary Judgment, Plaintiffs also request the court to declare

action. Each of the parties submitted their motions on the record established thus far.

After careful review of the entire record, the court finds that Defendant's Motion to Dismiss should be granted and Plaintiffs' Motion for Summary Judgment should be denied for the following reasons:

## II. FACTUAL SUMMARY

The material facts of this controversy are not in dispute. Plaintiff Lyndon H. LaRouche, Jr. seeks to be elected to the office of President of the United States. Plaintiff Billy M. Davis is Mr. LaRouche's choice as running mate for the Vice-Presidency. Defendant David S. Monson is Lieutenant Governor of Utah, and as such, is the officer charged with certifying to the County Clerks certain Candidate's names to be placed on the General Election ballot.

On August 28, 1984, Plaintiffs' National Ballot Access Coordinator sent a letter to Defendant requesting that Plaintiffs names be placed on the General Election ballot as independent Presidential and Vice-Presidential candidates. The letter was not accompanied with a verified petition signed by 300 registered voters in support of the nomination as required by Utah law. *See* U.C.A. § 20–3–38 (1984 Interim Supp.) Plaintiffs neither received a response from that letter nor from a similar, subsequent letter that was also unaccompanied by the requisite nomination petition.

On September 21, 1984, Plaintiffs' Ballot Access Coordinator spoke with "someone" in the Utah Election Division of the Lieutenant Governor's office who indicated to her that in order for Plaintiffs to have been placed on the ballot for that year, a certificate of nomination, signed by 300 registered voters, had to have been submitted to the Lieutenant Governor's office by September 12, 1984. *See* Affidavit of Mary Jane Freeman. September 12th was the date on which the Lieutenant Governor certified the content of the General Election ballot to Utah's 29 County Clerks in accordance with state law. U.C.A. § 20–3–30 (1984 Interim Supp.).

Plaintiffs tendered to the office of the Lieutenant Governor nomination petitions containing the required number of signatures on September 26, 1984, the date they filed their complaint and motions for injunctive relief. The signatures on the petitions had not been verified.

Plaintiffs' motions for a Temporary Restraining Order and for a Preliminary Injunction requested that this court restrain certification of the names for President and Vice-President without simultaneously certifying the names of Plaintiffs, and restrain the printing and distribution of Utah's General Election ballot pending trial of this matter. Plaintiffs argued that "they have complied with all reasonable statutory ballot access demands" and that the Lieutenant Governor continued to deny them access to the ballot "based on statutory provisions that are known to be suspect." *See* Affidavit In Support Of Motion For Temporary Restraining Order And Preliminary Injunction. Plaintiffs specifically targeted U.C.A. §§ 20–3–38 and 20–4–9 as the suspect statutes. Those statutes require independent candidates to file proper certificates of nomination no later than April 15th of the election year.[2]

In support of their allegations and argument, Plaintiffs relied primarily on *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 1565, 75 L.Ed.2d 547 (1983), a case in which the Supreme Court struck down

---

U.C.A. § 20–4–2 unconstitutional, asserting that that section provides:

> No candidate may file as an independent candidate who has previously filed in the same year a declaration of candidacy with any political party.

*See* Motion for Summary Judgment at 1–2. This court can find no such language in Section 20–4–2. The cited language is in Section 20–3–38 and will be treated accordingly.

**2.** U.C.A. § 20–3–38 (1984 Interim Supp.) states "[t]he certificates of nomination [for independent candidates] shall be filed in accordance with Section 20–4–9." Section 20–4–9 requires certificates of nomination to be filed between March 15 and April 15 of the election year. *Id.* at 20–4–9.

Ohio's March 20th early filing deadline as unduly burdensome of the associational rights of independent candidates and their supporters. Plaintiffs asserted that despite Utah's recognition that the *Anderson* case is controlling law in matters involving early filing deadlines preventing access to the ballot, Utah officials continued to refuse to certify Plaintiffs names.

There was substantial argument and testimony at the hearing, including testimony revealing that as of September 27th, the ballots for all but one of Utah's 29 counties were in some stage of the printing process. *See also* Affidavit of David Sasser. The court denied the requested relief because it found that Plaintiffs did not meet the initial showing of a reasonable likelihood of success on the merits.[3] *Atchison, Topeka and Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir.1981); *By-Rite Distributing, Inc. v. Coca-Cola Co.*, 577 F.Supp. 530, 539 (D.Utah 1983.).

### III. PRESENT MOTIONS

Plaintiffs' pending Motion for Summary Judgment requests the court to declare unconstitutional Utah's statutory filing deadline of April 15th. U.C.A. § 20–3–38 (1984 Interim Supp.). In addition, Plaintiffs ask the court to declare unconstitutional Utah's requirement that independent candidates must not have declared a candidacy with a political party for the year they seek to run as an independent. *Id.* Defendant moves to dismiss the action, asserting that in accordance with the court's ruling at the hearing for injunctive relief, the court has ruled in substance that Plaintiffs cannot establish a factual situation upon which relief can be granted.

At the outset, it should be noted that Plaintiffs' inability to show a reasonable probability of success on the merits at their hearings for injunctive relief manifested itself as an interesting dilemma. On the one hand, Plaintiffs' motions were premature in that they failed to comply with a requirement that nomination petitions be signed by 300 verified registered voters. Thus, Plaintiffs lacked standing to challenge a state acknowledged burdensome filing deadline. On the other hand, even if Plaintiffs were deemed to have standing to challenge a burdensome filing deadline, their challenge came far too late in the election process and was certain to fail on the merits. Plaintiffs face that same dilemma with regard to their present motion. The basis for the court's earlier denial of injunctive relief is more fully articulated below, and serves, in part, as the basis for the rulings on the present motions.[4]

### A. *Standing to Challenge the Filing Deadline*

Plaintiffs requested at the hearing and request now that this court rule on the burdensome nature of Utah's "early" filing deadline. In order for Plaintiffs to have standing to assert that claim, they must show that they "personally ha[ve] suffered some actual or threatened injury *as a result of the putatively illegal conduct of the defendant.*" *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 441 U.S. 91 (1979) [emphasis added]. In other words, plaintiffs must show that they were denied access to the ballot as a result of Defendant's imposition of an allegedly illegal filing deadline. The evidence presented by way of affidavit and testimony at the hearing, however, indi-

---

**3.** In addition to showing a reasonable probability of success on the merits, other requirements that must be established prior to receiving injunctive relief are: (1) a showing that the movant will suffer irreparable injury unless the injunction issues; (2) a showing that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (3) a showing that the injunction would not be adverse to the public interest. *Kenai Oil & Gas, Inc. v. Dept. of the Int. of the U.S.*, 671 F.2d 383, 385 (10th Cir.

1982); *Otero Savings & Loan Ass'n. v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir.1981); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980). Because Plaintiffs here failed in the initial showing, the court did not address the remaining requirements.

**4.** At the expedited hearing, the court reserved the right to expand in writing on the reasons then given for the denial of injunctive relief.

cates that the reason for the absence of Plaintiff's names from the ballot was and is their failure to comply with a nomination petition requirement—not their failure to comply with a filing deadline, even one the state acknowledges is burdensome.

The state statute governing the nomination of independent candidates for national office requires certificates of nomination to be accompanied with verified petitions containing the signatures of at least 300 registered voters who reside in Utah. U.C.A. § 20–3–38 (1984 Interim Supp.). Plaintiffs have yet to show that they have complied with that petition requirement. Plaintiffs admit that they did not submit petitions signed by any Utah voters until September 26th, the date on which they filed this action. *See* Complaint at 5, ¶ 11. Plaintiffs' counsel further represented at the hearing that the petitions submitted on the 26th had not been verified as required by the statute. The present record is devoid of any evidence to show that Plaintiffs have complied with the statute.

In response to that horn of their dilemma, Plaintiffs asserted at the hearing that Utah's requirement that nomination petitions be signed by 300 verified registered voters may also be unconstitutionally burdensome, or that Utah should be compelled to waive the petition requirement given Plaintiffs' particular circumstances. Those assertions, however, are entirely without merit.

### 1. Constitutionality of the Petition Requirement

It has long been established that a state has the undoubted right to require candidates to make a showing of support in order to gain access to the ballot, *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

In *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, Plaintiff challenged a Georgia statute that requires independent candidates to file a nomination petition signed by at least 5% of the number of registered electors who were eligible to vote in the previous election for the office in question. The Supreme Court refused to strike down the statute, noting that the 5% figure is somewhat high but balanced by the fact that there are no restrictions on the eligibility of signers other than that they be registered voters. *Id.* at 442, 99 S.Ct. at 1976. In so holding, the Court recognized that there was an important state interest in avoiding confusion, deception and frustration of the democratic process. Requiring a candidate to show a "significant modicum of support" before the candidate's name is placed on the ballot serves the state's interests without unduly burdening the constitutional rights of candidates or their supporters. *Id.*

In *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, the Supreme Court relied on its holding in *Jenness* and refused to invalidate a Texas statute that requires independent candidates to secure nomination petitions prior to the candidate's access to the ballot. Although the Texas statute requires a much smaller number of voter signatures on the petition than does Georgia's statute, upheld in *Jenness,*[5] Texas' statute was challenged as unduly burdensome because voters are barred from signing a petition if they have voted in the primaries and barred from signing more than one petition for the same office. *Id.* at 788, 94 S.Ct. at 1309. Plaintiff argued that the consequence of the restrictions, particularly that of eliminating voters who have participated in the primaries, so severely limits the pool of eligible signers as to make securing even 500 of them an impractical undertaking. The Supreme Court emphatically disagreed with Plaintiff's argument and noted that a claim that Texas' statute is unduly burdensome "approaches the frivolous." *Id.* at 789, 94 S.Ct. at 1310.

5. The number of signatures required by the Texas statute varies with the office sought. In no event are candidates required to file petitions containing more than 500 signatures of registered voters. *American Party of Texas,* 415 U.S. at 788, 94 S.Ct. at 1309.

■ The statute challenged here, U.C.A. § 20-3-38, requires independent candidates to file verified petitions containing the signatures of 300 registered voters. The portion of the statute requiring petitions to be verified is an obvious and necessary requirement to insure that a candidate demonstrates the support of persons who are in fact eligible to vote. The portion of the statute that requires candidates to obtain 300 voter's signatures is a very minimal burden. 300 signatures represents a figure less than .04% of the number of voters who registered in Utah's last general election.[6] Compared to Georgia's 5.0% requirement upheld in *Jenness*, Utah imposes a burden that is more than 100 fold reduced from that of Georgia. Additionally, Utah voters who have voted in the primaries are not ineligible to sign petitions of independent candidates: *See* Utah Code Ann. § 20-3-38. Thus, Utah's statute can be distinguished from the highly restrictive statute that was challenged, but upheld, in the *American Party of Texas* case. *See also Storer v. Brown*, 415 U.S. 724, 732-46, 94 S.Ct. 1274, 1280-86, 39 L.Ed.2d 714 (1974).

It appears that the only restriction on the eligibility of a registered voter is one that limits voters to signing one petition for the office in question.[7] Although that limitation could reduce the number of eligible signers, depending on the number of candidates running for the office in question, it would do so to an almost imperceptible degree.[8]

This court can find no authority to suggest that the rationale and holdings in *Jenness* and *American Party of Texas* are not controlling in this instance.[9] Indeed, the Supreme Court recently indicated a willingness to continue to recognize a state's legitimate right to require candidates to make a showing of support in order to gain access to the ballot. *Anderson v. Celebrezze*, 460 U.S. 780, 781, 788 & n. 9, 103 S.Ct. 1564, 1565, 1570 & n. 9, 75 L.Ed.2d 547 & n. 9 (1983). In light of the controlling precedent and the fact that Utah imposes what can be termed a miniscule burden of obtaining 300 voter signatures—signatures that are unre-

**6.** Utah had 781,711 registered voters in 1980. Of that number, 610,772 actually voted in the 1980 general election. *see* 1980 *General Election Abstract*, Lieut. Gov., State of Utah.

**7.** The relevant language of U.C.A. § 20-3-38 that contains the apparent restriction states:

The signatures to the certificate of nomination need not all be appended to one paper, but no certificate shall be legal that does not contain the requisite number of names of registered voters whose names do not appear on any petition previously filed under the provisions of this section.

That language certainly is not clear and unambiguous on its face or in context, despite the recent·amendments. . *cf.* U.C.A. § 20-3-38 (1953 as amended). Although susceptible of several interpretations, the only two having any basis in logic are that:

(1) voters cannot sign a petition for any given candidate more than once, or

(2) voters cannot signify support for two or more independent candidates running for the same office.

Because the second interpretation is the more restrictive, it is used for purposes of the analysis in this case, although the legislature would be well advised if it clarified its intentions.

**8.** Assuming that ten independent candidates wished to run for a particular office, the pool of eligible signers would be reduced by 3000, requiring a candidate to secure approximately .4% of the number of registered voters.

**9.** Plaintiffs suggest that the very recent case of *Bloomquist v. Thomson*, 739 F.2d 525 (10th Cir. 1984), supports their arguments. That case, however, is inapposite. In *Bloomquist*, Wyoming had amended its election statutes to require new political parties to obtain the signatures of 8000 registered electors, the majority of whom may not reside in the same county. The amendment was effective in April, 1984 and the deadline for obtaining signatures for that year was June 1, 1984. Plaintiffs challenged the constitutionality of the "two-county" rule and the constitutionality of the signature requirement as applied to them.

The United States Court of Appeals for the Tenth Circuit agreed that the two-county rule was an unconstitutional denial of equal protection. *Id.* at 526-528. In addition, the court found that due to the shortened time for obtaining signatures for the 1984 elections, plaintiffs need only have obtained 1,333 valid signatures prior to the June 1 deadline. *Id.* at 529.

The facts in the present case present neither the issue of a two-county rule nor the issue of an abbreviated period of time in which to secure a significant number of voter signatures.

stricted by the prior voting status of the signers—Plaintiffs have failed to show that the signature requirement unduly burdens their constitutional rights.

### 2. *Waiver of the Nominating Petition Requirement*

Plaintiffs have asserted that because they were able to demonstrate adequate support for their candidacy outside the borders of Utah,[10] Utah's interests were served and the petition requirement should be waived.

Plaintiffs' assertion may have some merit with regard to ensuring against absolutely frivolous national candidacies, but it does nothing to speak to a state's other legitimate interests. Each state surely has a genuine interest in regulating its ballot to provide one that is uncluttered, clear and meaningful *to its own citizens.* Demonstrating support elsewhere does not necessarily mean that the candidate has support in Utah. Regardless whom citizens of other states may support, citizens of other states simply cannot vote in Utah elections. Utah's genuine and important interest of providing for its own citizens is served by requiring a candidate to show at least *some* support within its borders before the state goes to the time and expense of certifying that candidate's name to the ballot. As emphasized previously, the minimal burden of obtaining 300 voter signatures amounts to little more that a "good faith" requirement that does not unduly burden a candidate's constitutional rights, despite a showing of voter support outside the state of Utah. Plaintiffs have put forth no valid reasons to justify a waiver of the signature

requirement under the present circumstances.

It appears, therefore, that Plaintiffs have failed to comply with at least one of Utah's reasonable statutory ballot access demands because they have not filed proper and complete certificates of nomination that include signed and verified petitions. Plaintiffs own affidavits suggest that if Plaintiffs had submitted certificates of nomination by September 12th containing the required number of verified signatures, they might well have been on the very ballot that was in the process of being printed at the time of the hearing. *See* Affidavit of Mary Jane Freeman, ¶ 7. Plaintiffs lacked Article III standing to request injunctive relief and continue to lack standing here to challenge a filing deadline because Plaintiffs' injury, if any, appears to be a result of their failure to comply with a reasonable nomination petition requirement, not the result of the imposition of an illegal filing deadline.[11]

### B. *Constitutionality of the Imposed Filing Deadline*

Even if this court assumes that Plaintiffs' certificates of nomination were proper and complete as of September 26, 1984, in that each petition contains 300 verified voter signatures,[12] Plaintiffs find themselves on the other horn of their dilemma: They were too late.

This court is aware that the Supreme Court holding in *Anderson v. Celebrezze,* 460 U.S. 780, 781, 103 S.Ct. 1564, 1565, 75 L.Ed.2d 547 (1983), may have an effect on Utah's *express* statutory filing deadline of April 15th, had Utah attempted to enforce

---

**10.** Plaintiffs' counsel asserted at the hearing for injunctive relief that Mr. LaRouche actively sought the 1984 nomination of the Democratic party, participating in some thirteen state primaries. The effort was unsuccessful. Mr. LaRouche then sought to run as an independent candidate and apparently appeared on the ballot as such in approximately nineteen states, evidencing voter support outside the state of Utah.

**11.** Plaintiffs also challenge U.C.A. § 20-3-38 on the basis that it purports to disqualify an independent candidate who has filed a candidacy

with a political party in the same year he seeks to run as an independent. There is not a scintilla of evidence in the record to suggest that Plaintiffs' absence from the ballot is due to their previous political affiliation. Plaintiffs, thus, lack standing to assert that challenge.

**12.** Plaintiff's counsel admitted at the hearing that the petitions submitted on September 26, 1984, do not contain signatures that have been verified. Nothing has been added to the record to suggest that the situation has changed.

such an "early" deadline. The fact is, Utah did not. The April 15th deadline is freely acknowledged by the state to be defective. It is for that reason the statutory deadline is, in practice, simply ignored. Plaintiffs knew that Utah officials had accepted one nomination petition and were amenable to accepting others from candidates if the petitions were complete, in proper form and tendered at a reasonable time prior to the general election. *See* Complaint at 6, ¶ 13. Plaintiffs were unaffected by the statutory deadline and as to them, it is simply a non-issue. Plaintiffs admit that they were told that their nomination petitions would have been accepted if proper and submitted by September 12th, the date on which the candidates names were certified to the County Clerks. *See* Affidavit of Mary Jane Freeman. The issue then, is whether a filing deadline of September 12th—the date imposed in this case—for an election to be held on November 6th, unduly burdens Plaintiffs' constitutional rights. In their motion for injunctive relief, Plaintiffs requested that this court literally "stop the presses" and mandate that Plaintiffs names be placed on the ballot. Plaintiffs could not make a reasonable showing at that time that the state's refusal to accept their nomination petitions filed after September 12th of the election year impermissibly impinged on their constitutional rights.[13] The court now finds that Utah's pragmatic filing deadline as applied to Plaintiffs, namely September 12th, the date of candidate certification by the Lieutenant Governor, is not unconstitutionally burdensome.

Plaintiffs are correct in asserting that *Anderson v. Celebrezze*, 103 S.Ct. 1565, governs constitutional challenges to state election laws that prescribe filing deadlines for access to the ballot. In that case, John Anderson had tendered a nomination petition on May 16, 1980, containing about 14,500 signatures. Defendant refused to accept the petition solely because it had not

been filed by the March 20th statutory deadline. *Id.* at 1566. In striking down the early filing deadline, The Supreme Court articulated and applied the following analysis:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Id.* at 1570.

A majority of the Court in *Anderson* noted that the primary concern in denying an independent candidate access to the ballot is not so much injury to the rights of the candidate as injury to the associational rights of the candidate's supporters. *Id.* at 1568–73. The magnitude of the injury to the voters rights in *Anderson* was great because the filing deadline occurred so very early in the election year. That deadline totally excluded candidates who made the decision to run after March, and heavily burdened signature-gathering and organizational efforts. Moreover, the deadline worked to discriminate against candidates and their supporters whose preferences are outside the existing political parties. *Id.* at 1570–73. The *Anderson* Court found that the state's articulated interests of voter education, equality of treatment and political stability were unquestionably outweighed by the imposed burdens. *Id.* at 1573–79.

In the present case, the character of the asserted injury is as it was in *Anderson* —impairment of the associational rights of Plaintiffs' and their partisans. In consider-

---

**13.** Plaintiffs also requested that the court enjoin the Lieutenant Governor from certifying the names on the ballot to the County Clerks. That certification, however, apparently took place on

September 12, 1984, some two weeks prior to the filing of Plaintiffs motions for injunctive relief. The court simply could not enjoin an action that had already been completed.

ing the magnitude of the asserted injury here, it is important to note several factors. First, Plaintiffs have shown that they have few, if any, voters in Utah who support them. Second, Utah officials are not attempting to impose a filing deadline that falls very early in the election year, but rather one that falls less than two months prior to the general election. Third, Utah officials are not attempting to impose a filing deadline that burdens Plaintiffs, as independent candidates, more than it does other political party candidates. Utah officials asserted at the hearing that absent exigent or unusual circumstances, all candidates whose names were to appear on the 1984 general election ballot must have complied with all reasonable election laws prior to certification of names on September 12th of this year. The magnitude of the asserted injury, therefore, is substantially less than that asserted in *Anderson* and does not differ from that of any candidate desiring to obtain access to the ballot after the names have been certified to the County Clerks.

The next inquiry, then, is whether there are sufficient state interests to justify Utah's refusal to place Plaintiffs names on the ballot after September 12th of this year. Utah undoubtedly has a legitimate and very practical interest in securing a reasonable amount of time to process documents submitted by the candidates and to prepare and distribute an error-free and timely ballot to its voters. The Supreme Court has acknowledged that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974).

The Utah state legislature has determined that the Lieutenant Governor should certify the names to be placed on the ballots on the fourth Wednesday following the August primaries. U.C.A. § 30-3-30. This year the Lieutenant Governor certified the names on September 12th. That left a period of less than two months for processing, printing and distribution of the ballots before the general election on November 6th. The Supreme Court in *Anderson* noted that "[s]eventy-five days appears to be a reasonable time for processing the documents submitted by candidates and preparing the ballot." *Anderson*, 103 S.Ct. at 1576. If seventy-five days is reasonable, then fewer than sixty days also is reasonable and clearly serves the state's legitimate interests.

At the time Plaintiffs submitted their voter-signed petitions on September 26th, the ballots for all but one of Utah's 29 counties were in some stage of the printing process. Some ballots had already been completed. Absent exigent and unusual circumstances [14], it is untenable to believe that the Constitution requires states to "stop the presses" or to reprint ballots up to the day of the election to accommodate particular candidates who wish instantaneous access to the ballot. *See Storer v. Brown*, 415 U.S. at 736, 94 S.Ct. at 1282. The line simply has to be drawn at some point. Plaintiffs have not shown that there were exigent or unusual circumstances that would justify "stopping the presses" in this instance.

## IV. CONCLUSION

It would seem that if a national candidate is at all serious about obtaining votes from a particular state, he or she should be able to discover and comply with reason-

---

**14.** At the hearing, Utah officials disclosed that they had recently amended the certification of names to add an additional independent candidate for President. Defendant reasoned that this was an example of exigent and unusual circumstances in that the particular candidate had tendered a complete and proper certificate of nomination on April 16th. Defendant asserted that in light of *Anderson,* it would have been unconstitutional not to take extreme measures to accommodate the candidate given the early compliance. *See Sonia Johnson v. Monson,* Civ. No. C–84–0838W (D.Utah, filed September 21, 1984). Plaintiffs here assert that they should be able to ride on the coat-tails of a remedy created to right the wrongs inflicted on another. This court does not agree.

able state election requirements that do not impermissibly impinge on constitutional rights. Utah's important regulatory interests and interests in serving its own citizens are sufficient to justify upholding the minimally burdensome petition requirement found at U.C.A. § 20–3–38. Further, Utah's interests in appropriately administrating the ballot are sufficient to support a finding that the filing deadline as applied in this case is also justified. The procedure and practice at issue here are even-handed and necessary to protect the integrity and reliability of the election process. They do not unconstitutionally burden the rights of Plaintiffs or their partisans.

Plaintiffs' Motion for Summary Judgment should be denied as a matter of law. Defendant's Motion to Dismiss should be granted.