**James D. WAIDE, III, Plaintiff,**

**v.**

**William L. WALLER et al., Defendants.**

**No. EC 75–106–K.**

United States District Court,
N. D. Mississippi, E. D.

Oct. 10, 1975.

James D. Waide, III, Weir, Miss., for plaintiff.

Ed Davis, Noble, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants.

Before CLARK, Circuit Judge, and KEADY and SMITH, District Judges.

KEADY, District Judge:

This action was brought by James D. Waide, III, an attorney recently licensed to practice and practicing in the State of Mississippi, seeking declaratory and injunctive relief against the enforcement of Miss.Code Ann. § 25–31–1 (1972),[1] a state law which requires district attorneys to be practicing lawyers admitted to practice before the Supreme Court of Mississippi for at least two years prior to taking office. Plaintiff contends that § 25–31–1 is subject to the strictures of § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, and that the statute's

1. The challenged statute, enacted as Laws of 1966, Ch. 389, § 1, provides:

"The district attorney shall possess all the qualifications of county officers and, in addition thereto, shall be a regular licensed and practicing attorney and shall have been duly admitted to practice before the supreme court of the State of Mississippi for a period of two years."

two-year practice requirement for political office-holding contravenes the Equal Protection Clause of the Fourteenth Amendment. We have jurisdiction under 28 U.S.C. §§ 1343(3), 1343(4). Named as defendants are William L. Waller, Governor, Heber Ladner, Secretary of State, and A. F. Summer, Attorney General, sued as members of the Mississippi State Election Commission, an agency with statutory authority to certify qualified candidates for places on the ballot in the State's general election.[2] Defendant Summer is also sued in his capacity as the Attorney General of Mississippi, the chief legal officer of the State on whom devolves the duty of submitting changes in election laws for approval under the Voting Rights Act.

Since plaintiff proceeds here under a Voting Rights Act claim, and additionally demands injunctive relief from the enforcement of a statute of apparent statewide application on constitutional grounds, a three-judge court has been convened pursuant to 28 U.S.C. §§ 2281, 2284, and 42 U.S.C. § 1973c. There were no disputes over the relevant facts in this action and the parties consequently submitted the case for decision without evidentiary hearing, relying on stipulations of fact, uncontroverted affidavits, and memorandum briefs. Because of the shortness of time remaining until the impending general election, we issued a final order in this case on September 25, 1975. This opinion explicates that judgment and discharges our remaining responsibilities under Rule 52(a), F.R.Civ.P.

Plaintiff is a Mississippi citizen and a 1968 graduate of Millsaps College. Soon after graduation from college, he volunteered for military service in the United States Marine Corps, serving a three-year tour of duty which included service in Southeast Asia. Upon his discharge from active duty, plaintiff enrolled in the Tulane University Law School, from which he was graduated in 1974. He now resides in Weir, Choctaw County, Mississippi, and has been admitted to practice before the Supreme Court of Mississippi and in the courts of this state since December, 1974. He seeks to become a candidate for the office of District Attorney of the Fifth Circuit Court District of Mississippi and have his name placed on the ballot as an independent candidate in the quadrennial general election scheduled for November, 1975. But for his palpable inability to satisfy the two-year practice requirement of § 25–31–1, the parties agree that plaintiff would be able to secure a ballot position without difficulty, for he meets all other qualifications demanded for the office.

The issue, then, is whether the two-year requirement of § 25–31–1 may constitutionally operate to keep plaintiff off the ballot. We believe that it can.

## I. The Voting Rights Act of 1965

Section 25–31–1 was enacted by the Mississippi Legislature at the 1966 regular legislative session, which, of course, was subsequent to the effective date of the Voting Rights Act of 1965. Prior to 1966, Mississippi demanded no special qualifications of her district attorneys. Thus, § 25–31–1, by limiting holders of the office to licensed and practicing attorneys of two years' standing, effected a significant reduction in the number of potential candidates for the office.

The Voting Rights Act, fully applicable in Mississippi by the operation of 42 U.S.C. § 1973b(a), requires that before any state under its coverage may "enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964", that state must either submit the proposed change to the Attorney General of the United States, with opportunity for him to interpose objection, or obtain a declaratory judgment from the United

2. See Miss.Code Ann. §§ 23–1–61, 23–5–1.

States District Court for the District of Columbia that the proposed enactment "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c.

■ That the statute here challenged, which prescribes the qualifications of all district attorneys throughout the State, is a voting qualification or standard to which the Act is directed cannot be disputed by the parties.[3] A statute which makes more stringent the requirements for political candidacy and thus limits to some extent the electorate's ability to choose does impact on voting rights in a fashion within the contemplation of § 5, and is, therefore, subject to § 5 provisions. See, e. g., *Hadnott v. Amos,* 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). See also 28 CFR § 51.4. Without § 5 compliance, such a statute would be ineffective, and, therefore, unenforceable. At the commencement of this action, § 5 compliance had not been obtained; indeed, it had never been sought. On September 5, 1975, however, soon after plaintiff raised the issue in his complaint, the Attorney General of Mississippi submitted the statute to the United States Attorney General for review. On September 23, 1975, the United States Attorney General, by telegram to the court, notified that his office would interpose no objection to § 25–31–1.

This action by the United States Attorney General obviated the problem here posed by the Voting Rights Act. ■ ■ The rule in federal litigation is plain. A live controversy sufficient to indulge the attention of an Article III court must be present at all stages of the litigation, and not merely at its commencement. See *Steffel v. Thompson,* 415 U.S. 452, 459–60, 94 S.Ct. 1209, 39

L.Ed.2d 505 (1974); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Thus,

"[i]f the case became moot before a final adjudication, we must vacate the judgment and direct that the case be dismissed. The district court has no power to decide moot causes." *New Left Education Project v. Board of Regents,* 472 F.2d 218, 220 (5 Cir. 1973).

The belated satisfaction of the Voting Rights Act requirements moots the first prong of plaintiff's attack on § 25–31–1, and we therefore certify that the challenged statute is in full compliance with the requirements of the Voting Rights Act.

*II. The Equal Protection Question*

Plaintiff's fourteenth amendment arguments against § 25–31–1 are next addressed. He contends first that the statute, by its two-year practice requirement for candidacy, significantly reduces voter choice and thereby unconstitutionally restricts the fundamental right to vote. A second effect of the statute which plaintiff perceives is its alleged infringement of his first amendment rights of association, which plaintiff understands to be violated whenever citizens are denied their right to offer for public office. Finally, he contends that, as applied in his case, the statute penalizes him for his decision to perform military service, thus infringing on what he views as his fundamental right to serve the United States in time of war.

At the outset, it is important to keep in view what is not at issue today. Plaintiff makes no criticism of that part of § 25–31–1 requiring that district attorneys be licensed and practicing

---

3. Neither is it gainsaid that plaintiff has standing to seek a declaratory judgment that § 25–31–1 is governed by § 5, and to pursue appropriate injunctive relief against its enforcement. *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1.

attorneys.[4] His only complaint, and the only question properly before the court, is whether, assuming the state may constitutionally require holders of the office of district attorney to be licensed attorneys, the state might also require the officeholder to have been licensed for a period of two years prior to his assumption of office.

The threshold inquiry in any equal protection challenge is a familiar one— the selection of the proper standard of judicial review in adjudging whether unconstitutional discrimination has · occurred.

■■ The traditional "rational relation" test, applied in the usual case, requires only that a legislative classification be rationally connected to a legitimate governmental objective to satisfy Fourteenth Amendment demands. *Turner v. Fouche*, 396 U.S. 346, 362, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). Under this standard, the challenged enactment benefits from a presumption of validity, and it is incumbent upon the plaintiff to show that the law can have no rational relationship to the achievement of any conceivable legitimate state goal. *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

■ When, however, a legislative classification is based upon suspect criteria, such as race or nationality, or when it results in substantial infringement of fundamental individual rights, the enactment is examined by the more rigorous "compelling state interest" test. Under this strict scrutiny, no presumption of validity is indulged, and the burden is placed on the defenders of the challenged provision to demonstrate that it is necessary to the promotion of a compelling state interest, and that there is no less restrictive alternative method of protecting the asserted governmental interest. *Dunn v. Blumstein*, 405 U.S.

330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). See *Shapiro v. Thompson*, 394 U.S. 618, 655, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (Harlan, J., dissenting).

■ There is no assertion that the two-year practice requirement classifies potential candidates on the basis of any suspect criteria. We therefore focus our attention on the impact of the challenged requirement on recognized fundamental rights.

■ Candidacy for public office has not been recognized as a fundamental right and cannot, per se, trigger strict scrutiny analysis;[5] therefore, it would appear that the two-year practice requirement, as a provision regulating the qualifications of candidates, does not directly infringe any fundamental right. The matter is not so simple, however, because a candidacy qualification may also implicate the rights of voters.

In *Bullock v. Carter, supra,* Texas law required candidates to pay substantial filing fees as a condition to having their names placed on the ballot in primary elections. In considering a challenge to this scheme by one financially unable to pay the filing fee, the Court said:

"The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. *McDonald v. Board of Elections*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739

4. As we have seen, plaintiff is himself a licensed and practicing attorney. In view of plaintiff's limited challenge to the statute, we need express no opinion on whether he has

standing to question a statutory provision which does not impede his own candidacy.

5. *Bullock v. Carter*, 405 U.S. at 142–43, 92 S.Ct. 849, 31 L.Ed.2d at 99.

(1969). Texas does not place a condition on the exercise of the right to vote, nor does it quantitatively dilute votes that have been cast. Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. The existence of such barriers does not of itself compel close scrutiny. Compare *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L. Ed.2d 554 (1971), with *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L. Ed.2d 24 (1968). In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." 405 U.S. at 142–43, 92 S.Ct. at 855.

The Court considered the effect of the Texas law on the voters and found that

"[t]he effect of this exclusionary mechanism on voters is neither incidental nor remote. Not only are voters substantially limited in their choice of candidates, but also there is the obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community . . . ." 405 U.S. at 143, 92 S. Ct. at 856.

It was under these circumstances that the Court concluded a realistic and close scrutiny of the challenged statute was impelled.

"Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper*, that the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." 405 U.S. at 144, 92 S.Ct. at 856.[6]

In examining the extent to which § 25–31–1's two-year practice requirement limits voter choice, as *Bullock* requires us to do, we are able to pinpoint its effect with rare precision. The undisputed proof is that on September 12, 1975, there were 87 licensed attorneys residing within the seven-county Fifth Circuit Court District of Mississippi. This, of course, represents the universe of potential candidates from whom the voters might choose in the absence of the challenged provision. We also know that only six of this number were admitted to the bar in 1974–75, or so recently that the two-year practice requirement would preclude their candidacy for district attorney. Clearly, then, the effect of § 25–31–1 on the range of voter choice is insubstantial. Moreover, there is little possibility that, as in *Bullock*, those candidates who are barred from the ballot are members or political representatives of any identifiable minority group which is singled out for disqualification by the operation of the statute. Because § 25–31–1 has no "real and appreciable impact on the exercise of the franchise" and because it does not classify on the basis of economic status or any other constitutionally disfavored criterion, it need only be measured against the rational relation test. When

6. Chief Justice Burger's noticeable softening of the stringent compelling state interest test (*reasonably necessary* . . . to . . . *legitimate* state objectives) in *Bullock* reflects an approach which has appeared increasingly in recent voting rights cases. See, e. g., *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed. 2d 1 (1973); *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

Whether these cases presage the emergence of a more lenient standard of equal protection review in cases involving strict scrutiny analysis it is still too early to say. We note them here because they do command a more receptive judicial attitude toward statutes regulating voting and candidacy.

For a thoughtful treatment of the problems and possibilities raised by the Court's recent voting rights and candidacy decisions, see Jardine, Ballot Access Rights: The Constitutional Status of the Right to Run for Office, 1974 Utah L.Rev. 290.

928

so tested, it plainly passes constitutional muster.

The district attorney in Mississippi has wide-ranging duties of critical significance to his constituency. Perhaps most importantly, he acts as prosecutor for the State in all criminal prosecutions and civil cases in his district in which the State or any county in his district has an interest. Miss.Code Ann. § 25–31–1 (1972). In his prosecutorial role, the district attorney safeguards the community from those who might pose dangers to the lives and property of its citizenry. Moreover, in the conduct of criminal prosecutions, the district attorney wields large power affecting the rights of citizens who may be proceeded against as criminal defendants and exposed to incarceration or fine, upon conviction. The considerable responsibility and authority of the office would justify the State in taking steps to ensure that the holder of such office is an attorney both knowledgeable in the law and experienced in the practice. To this end, it is surely not irrational to suppose that one who has been licensed to practice law for two years has, in that time, developed a greater measure of legal competence. See *Shenfield v. Prather*, 387 F.Supp. 676, 688 (N.D.Miss.1974, 3-judge court). We therefore hold that § 25–31–1 is a reasonable legislative act constitutionally related to a proper state function.

With respect to plaintiff's First Amendment argument, our research has revealed that only one court, the First Circuit in *Mancuso v. Taft*, 476 F.2d 187 (1973), has expressly found the First Amendment to extend to the right to offer for public office. The Supreme Court has not spoken directly to the question, but we believe indica-

tions are that, were the issue before it, the Court would decline to attach full First Amendment protection to plaintiff's candidacy. We are led to this conclusion by reading *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed. 2d 24 (1968) (holding that First Amendment rights are "fundamental" for purposes of equal protection review) with *Bullock v. Carter*, 405 U.S. at 142–43, 92 S.Ct. 849, in which the Court declined to grant "fundamental" status to candidacy or to judge all candidacy restrictions by strict scrutiny review.[7] It seems evident from *Bullock* that the Court does not view every statute setting qualifications for political candidates as infringing on First Amendment associational rights, at least to the extent of invoking strict scrutiny review.

Finally, we have uncovered no case classifying the right to perform military service as fundamental. However necessary standing armies may be to our national welfare, we are not convinced that the individual interest in military service should be considered a "basic civil right" on a par with procreation, voting and interstate travel. In any case, § 25–31–1 does not penalize voluntary military service, either facially or as applied here. It is true that plaintiff could not simultaneously serve in the Marine Corps and attend law school, but to contend that § 25–31–1 thereby punishes plaintiff for his military duty is to ignore the distinction between penalties on the exercise of rights and the natural consequences of voluntary choice.

Since we hold that the two-year practice requirement of § 25–31–1 does not offend the United States Constitution, the complaint filed herein must be dismissed with prejudice.

7. Cases containing dicta which may be read to implicate First Amendment rights in political candidacy arose in the context of state laws fencing out the economically disadvantaged and minority political parties from any effective political participation and freezing the political status quo in favor of currently reigning power groups. See *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). That is a far cry from the present case.