IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MAY 1998 SESSION



**FILED**

**March 16, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9706-CR-00198 |
| | ) | |
| | ) | Hamilton County |
| v. | ) | |
| | ) | Honorable Stephen M. Bevil, Judge |
| | ) | |
| NATHAN LEE COLQUIT, | ) | Aggravated burglary, aggravated robbery |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Ardena J. Garth
District Public Defender
    and
Karla G. Gothard
Assistant Public Defender
701 Cherry St., Suite 300
Chattanooga, TN 37402
(AT TRIAL)

Ardena J. Garth
District Public Defender
    and
Donna Robinson Miller
Assistant Public Defender
701 Cherry St., Suite 300
Chattanooga, TN 37402
(ON APPEAL)

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
        and
Elizabeth B. Marney
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

William H. Cox, III
District Attorney General
        and
Bates Bryan, Jr.
Rebecca J. Stern
Assistant District Attorneys General
County-City Building, Third Floor
600 Market Street
Chattanooga, TN 37402

OPINION FILED:_____

CONVICTIONS AFFIRMED; AGGRAVATED BURGLARY SENTENCE MODIFIED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Nathan Lee Colquit, appeals as of right from his convictions by a jury in the Hamilton County Criminal Court of aggravated burglary, a Class C felony, and aggravated robbery, a Class B felony. For the aggravated burglary conviction, he was sentenced as a Range III, persistent offender to fifteen years confinement to be served in the custody of the Department of Correction. For the aggravated robbery conviction, he was sentenced as a Range II, multiple offender to fifteen years confinement to be served in the custody of the Department of Correction. The sentences were ordered to be served concurrently. The defendant presents the following issues for our review:

> (1) whether the trial court erred by denying his motion to suppress the fruits of two warrantless searches and seizures of the car he was driving when arrested;
>
> (2) whether the trial court erred by failing to suppress the victim's identification of him from a photograph array;
>
> (3) whether the trial court erred by failing to instruct the jury on the lesser included offenses of assault and aggravated assault; and
>
> (4) whether the trial court erred in sentencing for the aggravated burglary conviction.

We affirm the convictions upon the jury verdicts but modify the sentence for aggravated burglary to reflect a sentence as a Range II, multiple offender to ten years confinement.

The evidence at trial established that on November 8, 1993, Kathryn Walker returned to her home to find that it had been ransacked. When Ms. Walker screamed, the defendant ran down the hall, wielding a gun, and ordered her to stop screaming or he would kill her. The defendant pushed Ms. Walker to the floor, covered her with a bedspread and fled. Ms. Walker described the assailant to Lieutenant John Bradford of the Chattanooga Police Department, and she provided Bradford with a list of items that were stolen, which included a mink coat, jewelry, credit cards and cash.

2

Ms. Walker later identified the defendant as the assailant from a photograph array, and she testified at trial that the defendant was the assailant.

At the suppression hearing, Bradford testified that he received a telephone call on November 11, 1993, from Captain Bobby Persinger of the Catoosa County Sheriff's Department in Georgia. Bradford said Persinger told him that on November 9, 1993, Persinger was involved in a car chase with the defendant and that in the car, Persinger found a mink coat bearing the embroidered name "Kathy Walker" inside of it. Bradford said he met with Persinger that day and photographed the coat, then he and Persinger went to the impound lot where the car was located. He said that when he looked in the car, he saw a camera, jewelry and other items, which he photographed.

Bradford testified that he met with the defendant, who was being held in Georgia on charges of evading arrest, reckless driving and possession of crack cocaine. He said that when he advised the defendant of his rights, the defendant refused to sign a waiver but agreed to talk. Bradford said the defendant told him that on November 8, 1993, he was staying with a friend at a motel, he took the friend to work in the morning, then he went back to the room and slept. The defendant told him that the car belonged to a female named Jan who loaned him the car in exchange for crack cocaine. The defendant told him that he knew nothing of the mink coat until he was arrested and that he knew nothing about the burglary.

Bradford testified that he took a photograph of the defendant. He stated that he constructed a photograph array but that he did not include the photograph of the defendant that he took on November 11. He said that instead, he included a photograph of the defendant from 1991. He said he asked the victim to look at the photograph array and to determine if she recognized the assailant. He testified that the

3

victim identified the defendant and that she felt fear when looking at his photograph. He admitted that before the victim looked at the array, he told her that a suspect had been arrested, but he said that he did not suggest to the victim which man in the array was the suspect. He said the victim also identified photographs of the mink coat and jewelry, and he then returned to Georgia and took possession of the victim's property.

On cross-examination, Bradford testified that the victim described the assailant as a slender black male, twenty-five to thirty years old, six feet tall, one hundred and eighty pounds and wearing a red bandana over his hair. He said the victim did not describe the defendant as having facial hair nor did she describe the defendant's teeth, voice, clothing, or distinguishing facial characteristics. He said that in arranging the photograph array, he tried to choose people who looked similar to the defendant, keeping in mind the victim's description. He said that he chose men with facial hair for the array because the defendant had facial hair in the photograph he used, and he did not want the defendant to look different from the other men. He said he used the 1991 photograph of the defendant instead of the more recent one because the older photograph had a background similar to the photographs of the other men in the array. He said the recent photograph had a yellow brick background.

Bradford said that when he met with Persinger on November 11, Persinger brought the mink coat and a maroon pouch containing jewelry. He admitted that he did not have a search warrant when he met with Persinger or when he and Persinger went to the impound lot. He said that when they went to the impound lot, he looked in the car before he opened the door and saw a camera on the passenger's side. He said he removed the camera from the car and found some jewelry in the trunk. He said he took the items to Chattanooga after photographing them, and he showed the items to the victim that night and released them to her when she identified them.

4

Captain Bobby Persinger of the Catoosa County Sheriff's Department testified that on November 11, 1993, he received a report from Officer Kelly Holcombe that Holcombe had tried to pull over a car but that the car did not stop and a chase was underway. Persinger testified that about that time, he saw the cars pass by him, and he followed behind Holcombe who was behind the defendant. He said the defendant was driving a gray, 1986 Buick Skyhawk and was traveling around fifty miles per hour in a forty mile per hour zone. He said that as the chase continued, the speeds escalated to between fifty and sixty miles per hour. He said the defendant passed traffic on the left side of the road, several times when cars were approaching in the opposite direction. He said the defendant struck another car at an intersection but continued driving. He said eventually the defendant pushed his brakes, causing his car to spin backwards and slide off the road before it hit a curb and stopped.

Persinger testified that the passenger, Wilbur "Shaky" Wilkes, got out of the car and was handcuffed. He said that although officers were yelling, the defendant would not get out, and his door was locked and could not be opened. He said the defendant was leaning over and had his hands down toward one of his legs. He said an officer broke the car window, apprehended and handcuffed the defendant. He said the car registration was checked and revealed that the car belonged to a woman from the area. He said he tried to verify the owner of the car but never made contact with anyone.

Persinger testified that a wrecker was called to tow the car because it was not fit to drive. He said that a tire and rim were gone and a window was busted. He testified that officers normally inventory a car before it is towed, and an officer inventoried the car in the present case. Persinger said he looked in the back seat of the car and saw a mink coat. He said the coat caught his attention because it did not match the car, and he took it out and noticed a name inside the coat.

5

Captain Persinger testified that soon after, he saw a newspaper article that mentioned that a mink coat had been stolen in a burglary in Chattanooga. He said he called Lieutenant Bradford in Chattanooga and asked him if the stolen coat was reported to have a name inside of it. Persinger told Bradford that he thought he had the coat. He said that the coat remained in the car after it was inventoried and towed and that he went to the impound lot and retrieved the coat after speaking with Bradford. He said he met with Bradford, and Bradford identified the coat. He said Bradford brought a list of property stolen from the victim, and they went to the impound lot and found a camera and jewelry in the car.

On cross-examination, Persinger testified that Officer Holcombe originally tried to stop the defendant for making an improper turn. He said the pursuit began in Catoosa County, Georgia, and ended in Walker County where the inventory was performed. He said his office's policy is that if a suspect flees from an officer, the suspect's car is towed. He said this is not a written policy. He said the inventory policy is that if a car is towed, it is inventoried. He identified his office's written standard operating procedures regarding vehicle inventory and impoundment and pointed to a policy that states that if there is no one present who is authorized and capable of removing a vehicle, it should be towed. He said he did not remember asking the defendant if he wanted the car towed or disposed of in another way. He said the car was not driveable because of the tire, and he could not find anyone to pick up the car because he could not make contact with the owner. He admitted that he thought the mink coat did not fit with the two men in the car and that he did not see the name embroidered in the coat until he removed it from the car. He said that when he and Bradford went to the impound lot, it was not to conduct an inventory but to retrieve property determined to be stolen.

Officer Terrence Kelly Holcombe of the Catoosa County Sheriff's Department testified that he saw the defendant make an improper turn. He said he pulled behind the defendant and turned on his blue lights, but the defendant would not stop. He said the defendant accelerated to forty or forty-five miles per hour on a curvy road and continued to accelerate to around seventy miles per hour once out of the curvy road. He said that Persinger eventually pulled behind him. He said that the defendant struck a Bronco, went into a ditch and came out with a flat tire but that the defendant continued to drive. He said the defendant stopped four to five miles later when he spun out of control and ran off the road.

Holcombe testified that the driver's side door was locked, and the defendant was bent down in the floorboard. He said the officers on the scene thought the defendant might have a gun, and they broke the driver's side window. Holcombe said the glove box was open, and there was a lot of jewelry in the glove box and on the floorboard. He said a wrecker was called, and he prepared an inventory list before the car was towed. He said he marked the "clothes" box on the inventory sheet to indicate the mink coat. He testified that he had checked the license plate number during the chase and that the car was registered to a woman. He said he did not know if anyone was able to contact the owner. He said that after the inventory was complete, the car was towed. He said that most of the items remained in the car but that some jewelry was taken out for evidence and was noted on the inventory sheet.

On cross-examination, Holcombe testified that cars are inventoried every time there is an arrest and a vehicle is involved. He said that the inventories are performed to protect the officers and the owners of the property. He said he later learned that a woman had been contacted, and she had said that the defendant and Shaky had permission to borrow the car. He said the coat was in the back seat when he performed the inventory.

The trial court denied the motion to suppress, finding that the jewelry had fallen out of the glove compartment and was in plain view, as was the mink coat. It found that the totality of the circumstances would cause any reasonable person suspicion and that there were "enough articulable and specific facts . . . that these items could very well be the fruits of a crime . . . ." It further found that the searches and seizures were proper because they were pursuant to an inventory.

## I. SEARCH AND SEIZURE

The defendant contends that the trial court erred by denying his motion to suppress the evidence obtained from the warrantless searches and seizures that occurred on November 9 and 11. He argues that the items did not fall within the plain view exception to the warrant requirement because their incriminating nature was not apparent. He further argues that the impoundment and subsequent inventory were improper because no other methods of removing the vehicle were offered to him and because the state failed to show that the impoundment was necessary.

The state initially argues that the defendant waived the issue of the improper impoundment by failing to raise it in the motion to suppress or in the motion for a new trial. It argues that, in any event, the impoundment was necessary because the car was not driveable, and there was no other alternative. The state further argues that the evidence was in plain view, and its incriminating nature was apparent. In the alternative, it argues that the discovery of the mink coat and jewelry was the result of a look, not a search. With respect to the second search of the car at the impound lot, the state argues that when impoundment is necessary, any subsequent search of the impounded vehicle is legal.

A trial court's findings of fact on a motion to suppress are conclusive on appeal. This court will not reverse a trial court's findings unless the evidence

preponderates against those findings. State v. Killebrew, 760 S.W.2d 228, 233 (Tenn. Crim. App. 1988).

## A. NOVEMBER 9 SEARCH AND SEIZURE

First, the defendant argues that the initial warrantless search of the car he was driving on November 9 when he was arrested and the seizure of the mink coat that occurred when Persinger removed the coat from the car violated the Fourth Amendment's prohibition against unreasonable searches and seizures. He argues that the search was not justified as an inventory search because the police had no right to impound the vehicle. We conclude that the November 9 search and seizure were valid as both a seizure pursuant to an inventory search and a search incident to a lawful arrest.

Initially, we note that the state contends that the defendant did not raise the issue of impoundment in his motion to suppress or his motion for a new trial. We believe that the issue of the legality of the search, which was raised in both motions, is inherently dependent upon the validity of the impoundment. Thus, the issue is properly before this court.

The Fourth Amendment to the United States Constitution provides that citizens have a right to be "secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ." Consequently, due process requires that evidence obtained in violation of the Fourth Amendment be inadmissible. See Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961). Generally, warrantless searches are unreasonable per se and are subject to only a few exceptions. See Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967).

9

One such exception to the warrant requirement is the "routine inventory search of an automobile lawfully impounded." South Dakota v. Opperman, 428 U.S. 364, 365, 96 S. Ct. 3092, 3095 (1976). The inventory search pursuant to a lawful impoundment is justified by the need to protect the owner's property while in police custody, the need to protect police against claims of lost property, and the need to protect police from potential danger. Opperman, 428 U.S. at 369, 96 S. Ct. at 3097. Our supreme court has delineated guidelines for determining whether an impoundment is lawful, and thus, a subsequent inventory search valid. Drinkard v. State, 584 S.W.2d 650, 653 (Tenn. 1979). In Drinkard, the court stated that:

> [I]f the circumstances that bring the automobile to the attention of the police in the first place are such that the driver, even though arrested, is able to make his or her own arrangements for the custody of the vehicle, or if the vehicle can be parked and locked without obstructing traffic or endangering the public, the police should permit the action to be taken rather than impound the car against the will of the driver and then search it. Just cause to arrest the driver is not, alone, enough; there must be reasonable cause to take his vehicle into custody.

Id. The burden of proving the propriety of the impoundment and subsequent search rests with the party seeking to introduce the fruits of the search. Id. (citation omitted).

The defendant maintains that the impoundment and subsequent inventory search of his car were unlawful. He relies on State v. Lunsford, 655 S.W.2d 921, 924 (Tenn. 1983). In that case, a police officer stopped the defendant's car and arrested the defendant on the suspicion of burglary. The officer asked the defendant if he would consent to the search of his trunk, and the defendant asked the officer if he had a search warrant. The officer said that he did not, and no further conversation ensued. The officer impounded the defendant's car and during an inventory search, the officer found stolen property. Our supreme court held that the impoundment and subsequent search of the defendant's car were unlawful and quoted with approval from a Florida Supreme Court opinion holding that an officer should "'advise a present, silent arrestee that his car will be impounded unless he can provide a reasonable alternative to

10

impoundment.'" Lunsford, 655 S.W.2d at 924 (quoting Sanders v. State, 402 So.2d 973, 974 (Fla. 1981)). The defendant in the present case contends that the officers did not consult with him about alternatives to impoundment. However, in Lunsford, the court also quoted with approval from Sanders that "'the extent of the consultation with the arrestee is a factor for the trial court to consider in determining whether the impoundment was reasonable and necessary.'" Lunsford, 655 S.W.2d at 924 (quoting Sanders, 402 So.2d at 974).

We hold that despite the officer's failure to ask the defendant if he had an alternative to towing the car, the impoundment and subsequent inventory search were reasonable and necessary. First, there was no one present at the scene to take control of the car. The defendant had been arrested and Shaky Wilkes was handcuffed and had no driver's license. Although the record indicates that the owner of the car may have been contacted, she was never at the scene to take control of the car. Furthermore, the car was not driveable and could not have been left where it came to rest. One of the tires was inoperable and a window was broken. In light of the foregoing, we conclude that there was no reasonable alternative to having the car towed. Thus, the trial court correctly determined that the search was proper as an inventory search pursuant to the lawful impoundment of the car. See State v. Roberge, 642 S.W.2d 716, 719 (Tenn. 1982) (holding that towing and inventory of car were proper where occupants were either too young or too intoxicated to drive and made no reasonable or plausible suggestions for the disposition of the car).

The state urges that the search and subsequent seizure were valid because the contents of the car were in plain view. However, in order to fall within the plain view exception to the warrant requirement, the incriminating nature of the evidence must be apparent. See Coolidge v. New Hampshire, 403 U.S. 433, 466, 91 S. Ct. 2022, 2038 (1971). Although Officer Holcombe testified that he thought the mink

11

coat did not fit with the two men in the car, the incriminating nature of the mink coat and the other items in the car was not sufficiently apparent, particularly upon confirmation that a woman owned the car. It was not until Captain Persinger learned that a mink coat had been stolen that the incriminating nature of the items in the car became apparent.

Although not raised by either party, we conclude that the search was valid as a search incident to a lawful arrest. See United States v. Robinson, 414 U.S. 218, 235, 94 S. Ct. 467, 477 (1973). Having placed the defendant under arrest, Officer Holcombe was entitled to conduct a search of the entire passenger compartment of the car. See New York v. Belton, 453 U.S. 454, 460, 101 S. Ct. 2860, 2864 (1981); State v. Watkins, 827 S.W.2d 293, 295-96 (Tenn. 1992). In summary, we conclude that the November 9 search and seizure were valid as both an inventory search following a lawful impoundment and as a search incident to a lawful arrest.

## B. NOVEMBER 11 SEARCH AND SEIZURE

Next, the defendant contends that the November 11 warrantless search and seizure at the impound lot violated the Fourth Amendment. He relies on the same arguments made with respect to the November 9 search and seizure. The state contends that when an impoundment is necessary, any subsequent search of the impounded vehicle is legal.

This court considered a similar issue in State v. J.R. Sanders, No. 01C01-9003-CR-00091, Davidson County (Tenn. Crim. App. Nov. 9, 1990). In Sanders, the defendant was a wholesale cocaine dealer who supplied cocaine to a retailer. The retailer was arrested with cocaine in the defendant's truck, and the truck was seized and taken to police headquarters where an inventory search was conducted. The officer found documents relating to the defendant's ownership of the truck and deeds to

12

property owned by the defendant. The officer seized the items relating to the truck's ownership but left the deeds in the truck. Fourteen months later and two weeks before the defendant's trial for conspiracy to sell and possession of cocaine, an officer returned to the truck and seized the deeds, which were used as evidence against the defendant at trial.

This court concluded that the original search was valid as a search incident to a lawful arrest, but the defendant argued that the second search fourteen months later was a separate warrantless search that was unreasonable. In upholding the validity of the second search and seizure, this court concluded that the officer "merely seized later what he could have seized earlier. No Fourth Amendment violation is implicated in this conduct." Sanders, slip op. at 5. For similar reasons, we conclude that the November 11 search and seizure were valid.

## II. PHOTOGRAPH ARRAY

The defendant contends that the trial court erred by failing to suppress the victim's identification of him from a photograph array. He argues that the array was unduly suggestive, thereby making the victim's identification unreliable. Specifically, he takes issue with the fact that the photograph of the defendant was two years old, that Lieutenant Bradford chose photographs of men who looked like the defendant, not men who matched the victim's description, and that Bradford told the victim that someone was arrested for the crime before the victim examined the array. The state contends that the evidence does not preponderate against the trial court's finding that the array was not unduly suggestive. We agree.

When the constitutionality of an out-of-court identification is challenged, suppression is only required when there is an unnecessarily suggestive procedure, and the totality of the circumstances shows that the identification was unreliable because of

13

the suggestiveness.  See Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977).  The Supreme Court has identified the following factors to be considered when determining whether an identification is reliable and thus admissible:

> (1) the opportunity of the witness to view the criminal at the time of the crime,
>
> (2) the witness' degree of attention,
>
> (3) the accuracy of the witness' prior description of the criminal,
>
> (4) the level of certainty demonstrated by the witness at the confrontation, and
>
> (5) the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 198, 93 S. Ct. 375, 381-82 (1972).  Furthermore, a victim's description need not be perfect to be reliable.

The factors set forth in Neil, as applied to the instant case, support the admissibility of the victim's identification.  Although the victim had only a relatively short amount of time to view the defendant, she was able to remember the defendant's approximate height, weight and build.  Nothing in the photograph of the defendant submitted as part of the array suggests that the victim's description was inaccurate.  Furthermore, the victim did not waver in her identification of the defendant, and only a short period of time, approximately three days, had lapsed between the crime and the identification.

With respect to the defendant's complaint that Lieutenant Bradford used a two-year-old photograph instead of the recent one, Bradford explained that the recent photograph was noticeably different from the photographs of the other men in the array.  Far from making the identification unreliable, we believe that the officer merely took steps to ensure that the array was fair.  The defendant also argues that Bradford chose photographs of men who resembled the defendant, not men who matched the victim's description.  On the contrary, Bradford testified that he chose photographs of men who

14

resembled the defendant, keeping in mind the victim's description. Again, the record shows that Bradford used care to ensure that the array was not unduly suggestive, and a review of the photographs of the other men in the array shows that they matched the victim's description. Finally, the defendant argues that the array was suggestive because Bradford told the victim that he had arrested a suspect before the victim looked at the array. However, Bradford never suggested to the victim which man in the array was the suspect. Rather, the victim identified the defendant on her own, and she did not waver in that identification. Based on these facts, we hold that the identification was properly admitted.

## III.  LESSER INCLUDED OFFENSES

The defendant contends that the trial court erred by failing to instruct the jury on the lesser included offenses of assault and aggravated assault. The state contends that the issue is waived because the defendant did not request an instruction on assault or aggravated assault nor did he raise it in his motion for a new trial. See T.R.A.P. 3(e). It argues that the issue is nevertheless without merit because the record shows that the defendant is guilty of the greater offenses, and there is no evidence to support a finding of guilt for assault or aggravated assault.

Pursuant to T.C.A. § 40-18-110(a), a trial court is required "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." When the evidence, introduced by either the state or the defendant, is susceptible of inferring guilt of a lesser grade or class or a lesser included offense of the charged offense, the trial court has a mandatory duty to charge such lesser offense. See T.C.A. § 40-18-110(a); State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996); Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Howard, 926 S.W.2d 579, 585-86 (Tenn. Crim. App. 1996). However, the instruction is

15

not required if there is no evidence in the record to support a conviction for the lesser offense. Trusty, 919 S.W.2d at 311.

With respect to the state's argument that the issue is waived because the defendant failed to request the instruction on the lesser included offenses, T.C.A. § 40-18-110(a) instructs otherwise. However, the state correctly argues that the defendant failed to raise the issue in his motion for a new trial, thus we are barred from review. See T.R.A.P. 3(e). In any event, the issue is without merit. While we agree that assault and aggravated assault are lesser included offenses of aggravated robbery, we do not agree that the evidence in this case warrants an instruction on either offense. The uncontested evidence shows that the defendant, brandishing a gun, stole items from the victim's home. The evidence establishes that the defendant is either guilty of the greater offense of aggravated robbery or not guilty at all. Nothing in the record suggests that the defendant could be found guilty of assault or aggravated assault. The defendant was not entitled to an instruction on those offenses. See State v. Shaw, 619 S.W.2d 546, 549 (Tenn. Crim. App. 1981) (holding that evidence showing that the defendant was guilty of robbery or no offense at all did not justify a jury instruction on the offense of assault).

## IV. SENTENCING FOR AGGRAVATED BURGLARY

The defendant contends that the trial court erroneously sentenced him to fifteen years incarceration for the aggravated burglary conviction. Specifically, he argues that the trial court erroneously used his Georgia cocaine conviction to sentence him as a Range III, persistent offender in the present case. He asks this court to determine an appropriate Range II sentence. The state concedes that the defendant should have been sentenced as a Range II offender. However, the state argues that the trial court correctly applied enhancement and mitigating factors and contends that

because the defendant received the maximum sentence as a Range III offender, he should receive the ten-year maximum sentence as a Range II offender.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1995).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the

17

potential for rehabilitation or treatment.  T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class B or C felony is presumptively the minimum in the range when there are no enhancement or mitigating factors present.  T.C.A. § 40-35-210(c).  Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors.  T.C.A. § 40-35-210(d) and (e).  The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record.  T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

In the present case, the record reflects that the defendant had three prior Class D felony convictions and one Class E felony conviction.  The record also reflects that on November 9, 1993, one day after the defendant committed the offenses in the present case, the defendant was charged in Georgia with a cocaine offense.  The trial court in the present case sentenced the defendant to the maximum sentence of fifteen years as a Range III, persistent offender.

Tennessee Code Annotated § 40-35-107(b)(1) provides that for the purpose of determining the proper sentencing range, a prior conviction is one that occurs before the commission of the offense for which the defendant is being sentenced.  See State v. Blouvett, 904 S.W.2d 111, 113 (Tenn. 1995).  Because the Georgia cocaine offense did not occur until one day after the defendant committed the offense in the present case, the trial court could not consider that offense for the purpose of classifying the defendant as a Range III, persistent offender.  Thus, the defendant should have been sentenced as a Range II, multiple offender.

18

With respect to the propriety of the trial court's application of enhancement and mitigating factors, the defendant does not point to any error in the record, and we are unable to find any. The record supports the maximum Range II sentence of ten years confinement to be served in the custody of the Department of Correction.

In consideration of the foregoing and the record as a whole, we affirm the convictions upon the jury verdicts of aggravated robbery and aggravated burglary. The aggravated burglary sentence is modified to reflect a sentence as a Range II, multiple offender to ten years confinement to be served in the custody of the Department of Correction concurrent with the aggravated robbery sentence.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Joe G. Riley, Judge

_____
James Curwood Witt, Jr., Judge