**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARIZONA LIBERTARIAN PARTY;
MICHAEL KIELSKY,

      *Plaintiffs-Appellants*,

v.

KATIE HOBBS, in her official
capacity as Secretary of State of
Arizona,

      *Defendant-Appellee.*

No. 17-16491

D.C. No.
2:16-cv-01019-
DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted March 12, 2019
San Francisco, California

Filed May 31, 2019

Before:  J. Clifford Wallace, A. Wallace Tashima, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Civil Rights / Elections

The panel affirmed the district court's summary judgment in favor of Arizona's Secretary of State in an action brought by the Arizona Libertarian Party challenging, under the First and Fourteenth Amendments, a state law requiring up to 1% of voters eligible to participate in Arizona's primary to sign a nominating petition for a Libertarian candidate to earn a place on the primary ballot.

Applying the balancing framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), the panel first held that the State's signature requirement imposed a minimal burden on the Libertarian Party's right to access the primary ballot. Accordingly, the panel determined that a less exacting scrutiny was appropriate.  The panel concluded that Arizona's signature requirements reasonably furthered Arizona's regulatory interest in preventing voter confusion, ballot overcrowding, and frivolous candidacies and justified the modest burden on the Libertarian Party's right to ballot access.

The panel rejected the Libertarian Party's contention that the Arizona law infringed upon its right to free association by effectively requiring its candidates to solicit signatures from non-members.  The panel held that any burden on the Libertarian Party's associational freedom was modest, and

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

again applying less exacting scrutiny, the panel credited Arizona's important interests to justify the reasonable requirements.

The panel further rejected the Libertarian Party's contention that Arizona's signature requirement violated equal protection, noting that the Libertarian, Democratic, and Republican Parties were all subject to the same statutory requirements.  The panel observed no equal protection issue in Arizona's treatment of the Green Party, a new party that was subject to different statutory requirements.

## COUNSEL

Oliver B. Hall (argued), Center for Competitive Democracy, Washington, D.C., for Plaintiffs-Appellants.

Kara M. Karlson (argued) and Joseph E. La Rue, Assistant Attorneys General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendant-Appellee.

## OPINION

McKEOWN, Circuit Judge:

Once again, we have before us a challenge to Arizona's requirements to earn a place on the ballot. *See, e.g.*, *Ariz. Green Party v. Reagan*, 838 F.3d 983 (9th Cir. 2016); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008).  The Arizona Libertarian Party challenges under the First and Fourteenth Amendments a state law requiring up to 1% of voters eligible to participate in its primary to sign a nominating petition for

a Libertarian candidate to earn a place on the primary ballot. The district court granted summary judgment to the Arizona Secretary of State (the "Secretary"), and we affirm.

## BACKGROUND

Under Arizona law, there are two types of political parties: "established" parties and "new" parties. A party is "established" in a jurisdiction if it (i) obtained at least 5% of the total votes cast in the prior general election, or (ii) maintains membership exceeding 0.66% of registered voters in that jurisdiction. Ariz. Rev. Stat. § 16-804 (applying to state, county, city, and town elections). An established party is entitled to "continued representation" on the general election ballot. *Id.* The Libertarian, Democratic, and Republican Parties are established statewide.[1]

Before 2016, to qualify for the primary ballot, an established party candidate needed to submit signatures[2] exceeding a certain percentage (ranging between 0.5% and 2%, depending on the office sought) of the party's registered voters in the jurisdiction where he sought election. Ariz. Rev. Stat. § 16-322(A) (2015). A candidate was permitted to submit signatures from party members, members of any

---

[1] The Libertarian Party satisfies the voter registration requirement, and the Democratic and Republican Parties satisfy both requirements. As of January 1, 2019, Arizona had 1.31 million registered Republicans, 1.17 million registered Democrats, and 32,056 registered Libertarians. Ariz. Sec. of State, *Voter Registration & Historical Election Data*, https://azsos.gov/elections/voter-registration-historical-election-data (last visited May 7, 2019).

[2] A voter may only sign one nominating petition per office per election, unless more than one candidate is to be elected to that office. Ariz. Rev. Stat. § 16-321(A).

new party, or unaffiliated registered voters.[3]   *Id.* § 16-321(D).

In 2015, the Arizona legislature amended the signature requirements for established party candidates. 2015 Ariz. Sess. Laws Ch. 293, §§ 2–3 (H.B. 2608). Now, to qualify for a primary ballot, an established party candidate must submit signatures exceeding a certain percentage of "qualified signer[s]," which include the party's registered voters, as well as all new party voters and unaffiliated registered voters. Ariz. Rev. Stat. § 16-321(F). The amendments reduced the signature threshold for each office to between 0.25% and 1%. *Id.* § 16-322(A). In 2016—the first election governed by the amended rules—there were significantly fewer Libertarian candidates on the primary and general election ballots than in prior elections. *See generally* Ariz. Sec. of State, *Historical Election Results & Information*, https://azsos.gov/elections/ voter-registration-historical-election-data/historical-election-results-information (last visited May 7, 2019) (collecting data for recent Arizona elections).

A "new" party is subject to different rules. A new party must first submit a petition for recognition and signatures from eligible voters exceeding 1.33% of total votes cast statewide in the prior gubernatorial election. Ariz. Rev. Stat. §§ 16-801(A), 16-803. After doing so, the party's candidates are eligible to pursue placement on the primary and general election ballots for the next four years. Ariz. Rev. Stat. § 16-801(B). To retain its recognition and ballot

---

[3] As of January 1, 2019, Arizona had 1.25 million unaffiliated registered voters. Ariz. Sec. of State, *Voter Registration & Historical Election Data*, https://azsos.gov/elections/voter-registration-historical-election-data (last visited May 7, 2019).

eligibility at the end of the four years, the party must either qualify as an established party or file another petition for recognition and the accompanying signatures. *Id.*; *see* Ariz. Rev. Stat. §§ 16-803–04.

To qualify for the primary ballot, a new party candidate must submit signatures exceeding 0.1% "of the total vote for the winning candidate or candidates for governor or presidential electors at the last general election within the district." Ariz. Rev. Stat. § 16-322(C). The Arizona Green Party first qualified as a new party in 1990, and, never having qualified as an established party, has successfully re-filed petitions for new party recognition and the accompanying signatures several times, most recently in 2014.[4] Since the beginning of 2017, Arizona has permitted digital solicitation and streamlined submission of voter signatures through an online portal. Ariz. Rev. Stat. §§ 16-316–18.

Under Arizona law, an established party member may not vote in another party's primary, but it is up to the established parties to decide whether new party members or unaffiliated voters can participate in their primaries. *See* Ariz. Rev. Stat. § 16-467.[5] The Libertarian Party excludes

---

[4] As of January 1, 2019, the Green Party had 6,450 registered members in Arizona. Ariz. Sec. of State, *Voter Registration & Historical Election Data*, https://azsos.gov/elections/voter-registration-historical-election-data (last visited May 7, 2019).

[5] A state may not keep a party from welcoming unaffiliated voters to participate in its primary, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 213–29 (1986), though it may prohibit party members from participating in another party's primary. *Clingman v. Beaver*, 544 U.S. 581, 586–97 (2005).

such voters, while the Democratic and Republican Parties do not.

In April 2016, the Libertarian Party and its chairman Michael Kielsky (collectively, the "Libertarian Party") filed this action challenging the primary signature requirements. The district court denied the Libertarian Party's request for a preliminary injunction prohibiting enforcement of the amended requirements for the 2016 election. The parties filed cross-motions for summary judgment, and, in July 2017, the district court granted summary judgment to the Secretary.

## ANALYSIS

The Libertarian Party contends that Arizona's ballot access scheme violates equal protection and infringes upon the right to place its candidates on the ballot[6] and the right to free association.[7] Only the rules governing access to the *primary* election ballot are at issue on this appeal—the Libertarian Party does not call into question the rules for earning a place on the *general* election ballot. With that in mind, we first set forth the balancing framework that guides our review and then explain why Arizona's rules for accessing the primary ballot are constitutionally sound.

---

[6] The Libertarian Party also contends that the statute violates its right to create and establish a political party. *See Norman v. Reed*, 502 U.S. 279, 288 (1992). This claim merely recites the right to access the ballot claim, and it fails for the same reasons. *See infra* pp.9–14.

[7] The Libertarian Party also appeals the district court's exclusion of certain evidence. That issue is moot because summary judgment for the Secretary is warranted even if we consider the excluded evidence.

## I.   The *Anderson*/*Burdick* Balancing Framework

There is an inevitable tension between a state's authority and need to regulate its elections and the First and Fourteenth Amendment rights of voters, candidates, and political parties. *See Storer v. Brown*, 415 U.S. 724, 729–30 (1974). To harmonize these competing demands, we look to *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), which provide a "flexible standard" for reviewing constitutional challenges to state election regulations:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). We have described this approach as a "sliding scale"—the more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny. *Ariz. Green Party*, 838 F.3d at 988. To pass constitutional muster, a state law imposing a severe burden must be narrowly tailored to advance "compelling" interests. *Norman*, 502 U.S. at 289. On the other hand, a law imposing a minimal burden need only reasonably advance "important" interests. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).

We now consider each of the Libertarian Party's constitutional challenges under the *Anderson*/*Burdick* balancing framework.

## II.  Right to Access the Ballot

It was long ago established that a state may condition ballot placement on a "preliminary showing of a significant modicum of support." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).  And there is no dispute that a state may require a candidate to demonstrate support from slightly, but not "substantially," more than 5% of voters without imposing a severe burden triggering heightened scrutiny.  *Storer*, 415 U.S. at 739–40; *see Jenness*, 403 U.S. at 442; *Williams v. Rhodes*, 393 U.S. 23, 24–25 (1968) (invalidating 15% requirement).  The Libertarian Party contends that Arizona law imposes an impermissibly high signature burden, reaching as high as 30% for certain candidates.  Yet, the threshold—and dispositive—question is *which pool of voters* we should consider when measuring this showing.

Under Arizona law, all qualified signers—Libertarian Party members, unaffiliated registered voters, and new party members—are eligible to participate in the Libertarian Party primary and to sign a Libertarian Party nominating petition. By its very terms, the statute never requires signatures from more than 1% of these voters.  However, by choice, the Libertarian Party has barred non-members from voting in its primary—under party policy, only members can vote in the primary.  And it does not want its candidates to solicit signatures from non-members; as a consequence, Libertarian candidates must submit signatures equal to 11% to 30% of party membership in their jurisdiction to qualify for the primary ballot.  Thus, our dilemma: is the "significant modicum of support" measured against all voters eligible under state law to sign a nominating petition and participate

in the primary?  Or do we factor in a party's decision to exclude certain eligible voters from its primary and instead consider the resulting, significantly circumscribed pool?

The Supreme Court has never expressly answered this question, but its framework in ballot access cases is instructive.  The state laws challenged in *Norman*, *Jenness*, and *Williams* required candidates and parties seeking placement on the general election ballot to submit signatures from registered voters equaling a designated percentage of the general election electorate.[8]  The Court's approach in these cases was straightforward: it determined whether the required signatures represented a reasonable share of the voters eligible to participate in the upcoming election.  *See Norman*, 502 U.S. at 295; *Jenness*, 403 U.S. at 438–40, 442; *Williams*, 393 U.S. at 24–25, 30–34.  In *American Party of Texas*[9] and *Storer*, the state laws imposed similar requirements, with an additional limitation: a voter who participated in another party's primary or convention or signed another candidate's petition was ineligible to sign a nominating petition.[10]  In both cases, the Court determined whether the required signatures represented a reasonable

---

[8] The laws challenged in *Norman and Williams* approximated the electorate by reference to the number of voters who participated in the preceding general election.  *Norman*, 502 U.S. at 282 n.2; *Williams*, 393 U.S. at 24–25.  The law challenged in *Jenness* approximated the electorate by reference to the number of registered voters during the previous general election.  403 U.S. at 432–33.

[9] *Am. Party of Tex. v. White*, 415 U.S. 767 (1974).

[10] Like the laws challenged in *Norman* and *Williams*, those at issue in *American Party of Texas* and *Storer* approximated the electorate by reference to the number of voters who participated in the preceding general election.  *Am. Party*, 415 U.S. at 774–75 & nn.6–7; *Storer*, 415 U.S. at 726–27, 739–40.

share of the "available pool" of signers, i.e., voters who had not disqualified themselves by participating in another primary or convention or by signing a previous petition. *Storer*, 415 U.S. at 739–40; *see Am. Party*, 415 U.S. at 774–91.

In each of these cases, the Court asked whether the required signatures constituted an unfairly large percentage of those voters *eligible under state law* to offer their signatures. There was no adjustment to account for the significant portion of this pool comprised of registered members of other parties, many of whom, it can be reasonably presumed, were unlikely to help nominate a competing candidate or party. Nor was there any suggestion that a candidate should be limited to seeking signatures from voters who have already pledged their support to the candidate or his party or cause. Rather, the Court time and again affirmed that requiring a demonstration of "significant, measurable quantum of community support" does not impose a severe burden. *Am. Party*, 415 U.S. at 782.

We invoked a similar analysis in *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010). And we do so again here. Arizona law permits all qualified signers— Libertarian Party members, new party members, and registered unaffiliated voters—to sign a Libertarian candidate's nominating petition and to vote in the Libertarian primary. However, qualified signers who already signed another candidate's nominating petition are excluded from the "available pool" of voters able to sign a Libertarian candidate's petition.

No evidence suggests that, in practice, the statute's (at most) 1% signature requirement even approaches 5% of this remaining pool of eligible signers. It falls upon the Libertarian Party to demonstrate that Arizona imposes a

severe burden, and it has failed to do so here.  The party's policy choice to exclude all non-members from its primary and its preference to obtain signatures only from party members do not change the calculus.  To hold otherwise would permit a party to determine the number of signatures required by manipulating its nominating petition and primary voting requirements.  At the same time, the Libertarian Party's proposed rule would incentivize parties to have fewer registered members and therefore artificially reduce the signature requirements.  Just as important: where, in this scheme, is the offensive state action?  There is no question that the signature requirement would be constitutional if the Libertarian Party permitted non-members to vote in its primary.  A political party cannot manipulate its internal preferences and processes to transform a constitutional statute into an unconstitutional one.[11]

Crucially, Arizona law does not impose any other requirements, such as a strict time period for signature collection, that might nonetheless render the 1% requirement "an impossible burden" or "an impractical undertaking." *Storer*, 415 U.S. at 740 (requiring 1,000 canvassers to collect 14 signatures each day for 24 days likely imposes a modest burden); *see Clingman*, 544 U.S. at 589–90 (limiting a party's internal structure, decision-making processes, and ability to communicate with the electorate likely imposes a

---

[11] Neither of the cases cited by the Libertarian Party persuades us otherwise.  One addressed a law that made it "impossible either absolutely . . . or practically" for a candidate to meet a signature requirement. *See Consumer Party v. Davis*, 633 F. Supp. 877, 883 (E.D. Pa. 1986).  The other struck down signature requirements because they imposed disparate requirements on similarly situated parties that were, the state conceded, impossible to justify. *In re Candidacy of Indep. Party Candidates v. Kiffmeyer*, 688 N.W.2d 854, 859–61 (Minn. 2004).

severe burden); *Timmons*, 520 U.S. at 363 (same); *Anderson*, 460 U.S. at 790–94 (requiring an independent candidate to file several months before party conventions imposes severe burden); *Am. Party*, 415 U.S. at 778–81 (requiring all signatures to be notarized and submitted in 55-day period does not impose severe burden); *Jenness*, 403 U.S. at 434, 438 (permitting 180 days for collection of nominating signatures and requiring submission of signatures five months before election does not impose severe burden); *Williams*, 393 U.S. at 24–25 & n.1 (conditioning minor party's ballot access on formation of statewide and county-level party committees, participation in a national party convention, and submission of nominating signatures by an early deadline exclusively from voters who never voted in a previous election imposes significant burden).  To the contrary, Arizona permits candidates to solicit and submit signatures through an easy-to-use and streamlined online portal.  A candidate collecting hand-written signatures must, in practice, collect more than the minimum number of signatures required because, inevitably, some will be deemed ineligible.  In contrast, signatures submitted through the online portal are instantaneously verified, thereby reducing the need to submit signatures above the threshold.

The limited evidence describing the Libertarian Party's modest efforts to mobilize voters and several candidates' unsuccessful write-in campaigns fails to establish that, in practice, Arizona law "imposes insurmountable obstacles" to getting on the primary ballot.  *Am. Party*, 415 U.S. at 784.  Nor does the simple fact that the Libertarian Party had more candidates on past primary and general election ballots reflect such an obstacle under the amended rules.  *See Munro v. Socialist Workers Party*, 479 U.S. 189, 196–97 (1986).  Accordingly, we apply "less exacting" scrutiny because Arizona law imposes a minimal burden on the Libertarian

Party's right to access the primary ballot. *Timmons*, 520 U.S. at 358; *see Cronin*, 620 F.3d at 1218.

We now turn to whether Arizona has an "important regulatory interest" that justifies this modest burden. *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). Arizona's asserted interests in preventing voter confusion, ballot overcrowding, and frivolous candidacies are important interests that have justified equally, if not more, burdensome general election ballot restrictions. *See Munro*, 479 U.S. at 194–95. These interests are also important in the primary context, given the "obvious and strong interconnection" between primary and general elections, which together operate as a "single instrumentality for choice of officers." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1026 (9th Cir. 2016) (quoting *Smith v. Allwright*, 321 U.S. 649, 660 (1944)); *see Storer*, 415 U.S. at 735 (A primary election "functions to winnow out and finally reject all but the chosen candidates."). Conditioning primary ballot placement on a demonstration of significant community support advances Arizona's interests in the administration of its primary *and* general elections. *See Anderson*, 460 U.S. at 788–89; *see also Jenness*, 403 U.S. at 442; *Munro*, 479 U.S. at 193–94.

Because we neither require "a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies," *Munro*, 479 U.S. at 194–95, nor proof that ballot rules are "the only or the best way to further the proffered interests," *Dudum v. Arntz*, 640 F.3d 1098, 1114 (9th Cir. 2011), Arizona has easily met its burden. The primary signature requirements reasonably further Arizona's important regulatory interests and therefore justify a modest burden on the Libertarian Party's right to ballot access.

## III.    Right to Free Association

The Libertarian Party contends that Arizona law infringes upon its right to free association by effectively requiring its candidates to solicit signatures from non-members.  Although the Constitution protects a political party's right to not associate with non-members, that right has its limits.  *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 567 (1973).  We first ask whether Arizona in any way "forces" the Libertarian Party to associate with non-members.  *Cal. Democratic Party v. Jones*, 530 U.S. 567, 577, 581–82, 586 (2000).  If so, we then consider whether such forced association creates a "risk that nonparty members will skew either primary results or candidates' positions."  *Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1282 (9th Cir. 2003).  We answer both questions in the negative.

Unlike the state laws at issue in *Jones* and *Bayless*, Arizona law permits political parties to exclude non-members from voting in their primaries.  At their option, Libertarian candidates *may* use signatures from non-party members to qualify for the primary ballot—but Arizona law does not require them to do so.  Soliciting non-member signatures would seemingly prove helpful in placing more candidates on the primary ballot, but it is the Libertarian Party's modest membership, not a "state-imposed restriction on [its] freedom of association," that imposes upon it this "hard choice."  *Jones*, 530 U.S. at 584.[12]

---

[12] In *Jenness*, the Supreme Court noted that, for an independent or minor party candidate seeking "signatures of 5% of the eligible electorate[,] . . . the way is open [because] Georgia imposes no suffocating restrictions whatever upon the free circulation of nominating

We acknowledge, without deciding, that there may be some point where the ratio between party members and required signatures constitutes *de facto* forced association with non-members. For example, if the signature requirement exceeded the number of party members, then a candidate necessarily would, as a matter of arithmetic, have to solicit non-member signatures to qualify for the ballot. But we face no such situation here. Libertarian candidates can qualify for the primary ballot with signatures from 11% to 30% of party members in their jurisdictions, and no evidence suggests it is impossible to do so as a practical matter. Even if collecting these signatures is difficult, we expect "[h]ard work and sacrifice by dedicated volunteers" in the operation of "any political organization." *Am. Party*, 415 U.S. at 787. Such expectations do not in any way "force" Libertarian candidates or voters to associate with non-members.

Nor has the Libertarian Party demonstrated that the solicitation and submission of some non-member signatures "will skew either primary results or candidates' positions." *Bayless*, 351 F.3d at 1282. We decline to embrace such a speculative conclusion. Any burden on the Libertarian Party's associational freedom is modest, so we again apply less exacting scrutiny and, as above, credit Arizona's important interests to justify these reasonable requirements. *See Timmons*, 520 U.S. at 358.

---

petitions." 403 U.S. at 438. The Court identified various limitations on signature collection that could be, but were not, imposed under Georgia law. *Id.* at 438–39. That a minor party candidate would likely obtain signatures from non-party members was presupposed by the Court, not as a bug of this system, but as a positive feature. *Id.*

## IV.    Equal Protection

Finally, the Libertarian Party contends that the signature requirements violate equal protection because they impose lesser burdens on other parties.[13]    The Libertarian, Democratic, and Republican Parties are all established parties subject to the same statutory requirements. Although, on its face, Arizona law treats them identically, we look to see whether the requirements provide "a real and essentially equal opportunity for ballot qualification." *Am. Party*, 415 U.S. at 788.  That standard is clearly satisfied here.  A Libertarian candidate vying for the primary ballot actually faces a significantly *lower* burden than his Democratic and Republican counterparts.  For example, a statewide Libertarian candidate needs to submit approximately 3,200 signatures, compared to 6,000 and 6,400 signatures for the Democratic and Republican competitors, respectively.  *See* Ariz. Rev. Stat. § 16-322(A)(1); Ariz. Sec. of State, *Voter Registration & Historical Election Data*, https://azsos.gov/elections/voter-registration-historical-election-data (last visited May 7, 2019).[14]

That a Libertarian candidate must submit signatures representing a higher percentage of his party membership than a Democratic or Republican candidate is a consequence

---

[13] Despite their differences, we assume, without deciding, that the Libertarian Party is similarly situated to the Democratic, Republican, and Green Parties and that the Equal Protection Clause applies. *See Cronin*, 620 F.3d at 1218.

[14] Of course, the signature ratio between parties varies within each political subdivision, as voters are not perfectly distributed throughout the state.  The statewide figures are sufficiently representative for our purposes.

of the Libertarian Party's modest size, not a fatal flaw of the statutory scheme. The Supreme Court has indicated that an analogous imbalance lacks constitutional significance. In *Illinois State Board of Elections v. Socialist Workers Party*, the Court struck down on equal protection grounds a state law requiring local candidates to submit substantially more signatures to qualify for the ballot than statewide candidates. 440 U.S. 173, 186–87 (1979). The remedy: imposing the same, 25,000 signature requirement for both local and statewide candidates, even though the eligible voter pool for statewide candidates was *six times* larger than the pool for certain local candidates. *See id.* at 183–87. If such an outcome comports with equal protection, then surely so does the situation here.

Even if we assume that the signature requirements impose a marginally higher burden on the Libertarian Party, that additional burden is far from severe. *Cf. Williams*, 393 U.S. at 25 (striking down state law that imposed "substantially smaller burdens" on certain parties, while making it "virtually impossible" for others to place a candidate on the ballot). Under less exacting scrutiny, we again conclude that the same important regulatory interests justify the signature requirements. In setting the threshold for a "significant modicum of support," *Jenness*, 403 U.S. at 442, a state must use either an absolute number of voters or a percentage of some group. Not only is it mathematically impossible to craft a statute where the burden on each party is identical under both measurements, Arizona has no obligation to seek such precision. *See Dudum*, 640 F.3d at 1114 (recognizing regulations need not be "narrowly tailored"). Nor was Arizona required to replicate or fold in the preexisting burdens on each party when it amended the ballot access rules in 2015. *Cf. Ohio Democratic Party v. Husted*, 834 F.3d 620, 623 (6th Cir. 2016) (rejecting an

argument "creat[ing] a 'one-way ratchet' that would discourage states from" increasing ballot access, "lest they be prohibited by federal courts from later modifying their election procedures in response to changing circumstances"). Arizona's choice to set the threshold as a percentage of qualified signers for each established party was neither discriminatory nor unreasonable.

Arizona opted to apply these signature requirements for all parties that have a significant membership and therefore exempt such parties from the quadrennial party-wide re-certification requirements imposed on new parties. This policy affords significant benefits to all established parties and furthers the state's interests in avoiding voter confusion, minimizing clutter on the primary and general ballots, and eliminating frivolous candidacies.[15]

We likewise observe no equal protection issue in Arizona's treatment of the Green Party, a new party subject to different statutory requirements. When, as here, we "examin[e] differing treatments of [different types of political parties], . . . [i]n determining the nature and magnitude of the burden that [the state's] election procedures impose on the [complaining party], we must examine the entire scheme regulating ballot access." *Cronin*, 620 F.3d at 1217 (internal quotations and citation omitted). Equal protection is violated when one set of

---

[15] The Libertarian Party's reliance on *Kiffmeyer* is, once again, unpersuasive. There, two minor political parties were subject to the same ballot access rules; under those rules, one party had all of its candidates placed on the general election ballot, and the other had none on the ballot, even though the latter received significantly more votes in the primary. *Kiffmeyer*, 688 N.W.2d at 859–61. Minnesota conceded that these rules were arbitrary and lacked any "rational . . . purpose." *Id.* at 861.

requirements is "inherently" or "invidiously" more burdensome than the other. *Am. Party*, 415 U.S. at 781; *Jenness*, 403 U.S. at 440–41; *Cronin*, 620 F.3d at 1218–19.

The Libertarian Party's chief complaint is that Green Party candidates qualified for the 2016 primary ballot with significantly fewer signatures than Libertarian candidates for the same races.[16]  This argument fails to account for the significant quadrennial re-filing burden placed on the Green Party to retain its new party status.  Every four years, the Green Party, which currently boasts less than 6,500 members, must submit more than 20,000 signatures for its candidates to be eligible to pursue placement on the ballot.  That is, signatures from three times more voters than it has registered members.  Meeting the re-filing requirements is "an all-consuming endeavor" for the Green Party, which relies on "a core group of about 10 volunteers" to work "every weekend on Saturdays and Sundays for several hours each" for more than a year.  It is only once this step is complete that the modest individual candidate signature thresholds apply.  Thus, it is obvious that the primary ballot signature requirements for the Libertarian Party are not "inherently" or "invidiously" more burdensome than those imposed on the Green Party.  *Am. Party*, 415 U.S. at 781; *Jenness*, 403 U.S. at 440–41.  To be sure, "[t]he procedures are different, but the Equal Protection

---

[16] The Libertarian Party also complains that a write-in new party candidate automatically qualifies for the general election ballot by winning his primary, while a write-in established party candidate only qualifies for the general election ballot if he wins his primary with votes equaling the number of signatures needed to qualify for the primary ballot. *See* Ariz. Rev. Stat. § 16-645(D)–(E).  Because the Libertarian Party expressly disclaims any challenge to Arizona's general election ballot access requirements, we do not consider this argument.

Clause does not necessarily forbid the one in preference to the other." *Am. Party*, 415 U.S. at 781–82.

## CONCLUSION

Arizona has no "constitutional imperative to reduce voter apathy or to 'handicap' an unpopular [party] to increase the likelihood that [its] candidate[s] will" qualify for the primary ballot. *Munro*, 479 U.S. at 198. The state's signature requirements are reasonable restrictions that impose, at most, a modest burden on the Libertarian Party's First and Fourteenth Amendment rights, while directly advancing Arizona's important regulatory interests. The district court correctly granted summary judgment to the Secretary.

**AFFIRMED.**